IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, )
)
          Plaintiff, )    CRIMINAL NO. 22-CR-634 JB
)
)
   vs. )
)
**ROBERT PADILLA, a.k.a. "Fathead,"** )
)
          Defendant. )

## UNITED STATES' RESPONSE TO
## DEFENDANT ROBERT PADILLA'S MOTION FOR RECUSAL

The United States of America hereby responds in opposition to Defendant Robert Padilla's

Motion for Recusal, Doc. 103.

### Background

Defendant Robert Padilla was initially charged in this case by Indictment on April 20,

2022.   Doc. 5.   Defendant is currently charged in this case with the following:   18 U.S.C. §

1959(a)(1): Violent Crimes in Aid of Racketeering (Murder);   18 U.S.C. § 1513(a)(1)(B):

Retaliating Against a Witness, Victim, or Informant;   18 U.S.C. § 848(e)(1)(A): Killing While

Engaged in Drug Trafficking; 18 U.S.C. § 924(c)(1)(A)(ii), (iii), and 924(j)(1): Using, Carrying

and Brandishing a Firearm During and in Relation to a Drug Trafficking Crime; Possessing and

Brandishing a Firearm in Furtherance of Such Crime; Discharging Said Firearm; and Causing

Death Through Use or Possession of a Firearm; 18 U.S.C. § 1512(a)(2)(C): Witness Tampering;

21 U.S.C. § 846: Conspiracy; 21 U.S.C. §§ 841(a)(1) and (b)(1)(E): Possession with Intent to

Distribute Buprenorphine; and 18 U.S.C. § 1791(a)(2): Possession of Contraband in Prison.   Doc.

1



80.    The murder charges relate to the death of a former Syndicato de Nuevo Mexico (SNM) gang leader that cooperated with the United States.    As to Defendant Padilla, the indictment itself refers to him as an associate of the SNM.    *Id*. at 2.

Defendant was also charged with drug trafficking crimes on September 11, 2019 in CR 19-3113 JB. Those charges remain pending.

On March 3, 2021, the FBI served search warrants in Phase V of the investigation against the SNM.    Specifically, the FBI was investigating threats against a former SNM gang leader, along with drug trafficking and felons being in possession of firearms offenses.    *See* Exh. 1. Five persons were targeted, of which, one was arrested for possession with intent to distribute methamphetamine and heroin, one was arrested for an outstanding warrant and also being a felon in possession of a firearm, and a third was arrested on a parole state warrant.    *See* Exh. 2. Notably, no charges were filed in relation to the threats against a witness.

As it relates to Defendant Padilla, the voluminous search warrant only mentions him twice. The first reference relates to an incident in November 2020 when a cooperating defendant overheard SNM gang members and Defendant "discussing the government's case against the SNM."    Exh. 1 at 45.    The search warrant affidavit states that "the SNM members and Robert Padilla discussed putting a green light on Acee, Armijo, and Browning" and "lighting up the courtroom" when the case(s) went to trial.    *Id*. at 45-46.    This same incident is referred to again and is described as the "SNM members and an associate discussing the fact that a greenlight had been put on Bryan Acee, a federal judge, and an AUSA."    *Id*. at 67.

Defendant Padilla is now seeking this Court to recuse itself based on the alleged threats in 2021.[1]   Doc. 103.   Specifically, the Defendant is asserting that "law enforcement concluded" that the Defendant "was a member of the SNM prison gang, and that he and members of the SNM were plotting to kill Judge Browning and members of the prosecution team.[2]"   Doc. 103 at 8-9.

### Law and Argument

After having this case before the same Judge since the inception, the defense is now requesting recusal based on facts it has known the entire pendency of this prosecution. Specifically, the defense requesting this Court to recuse itself from presiding over further proceedings in this cause "because a reasonable person would have ample reason to question the Court's impartiality" in this case.   Doc. 103 at 2.

28 U.S.C. § 455 governs the circumstances under which a judge should consider recusing himself.  "Recusal under section 455 is to be judged on the record.  It is not a question of either the government or the defendant bearing a burden of proof.  Rather, recusal is an action taken by the judge, and the judge must document the reasons for his or her decision so that the decision may be reviewed, if necessary, by an appellate court." *United States v. Greenspan*, 26 F.3d 1001, 1007 (10th Cir. 1994).   "Under section 455(a), the judge is under a continuing duty to ask himself what a reasonable person, knowing all the relevant facts, would think about his impartiality." *United States v. Hines,* 696 F.2d 722, 728 (10th Cir.1982) (citing *Roberts v. Bailar,* 625 F.2d 125, 129 (6th Cir.1980)). Moreover, "a trial judge has as much obligation not

---

[1] It should be noted that the USMS investigated a new alleged threat by SNM members in 2023 against Judge Browning and the prosecution team.   *See* Exh. 3.   However, the USMS will be closing out the investigation because the tipster indicated that the information they provided was not truthful when interview by the FBI and USMS.

[2]  As stated previously, the affidavit refers to Defendant as an SNM associate, and not a member.

3

to recuse himself when there is no reason to do so as he does to recuse himself when the converse is true." *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 503 F.Supp. 368, 370 (N.D.Ohio 1980).

A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). On the other hand, "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." *Greenspan*, 26 F.3d at 1005.

Specifically, "the test in this circuit is whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993). "The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom." *Id.*

The "totality of the circumstances" should be viewed to determine whether there was an appearance that the trial court was prejudiced against a defendant. *Greenspan*, 26 F.3d at 1006. The Tenth Circuit has never laid down a categorical rule, in *Greenspan* or any other case, requiring recusal every time a judge learns of an extrajudicial threat to question a judge's impartiality in the first place. Cases under § 455(a) "are extremely fact driven and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." *Wells*, 873 F.3d at 1251.

To be sure, in *Greenspan*, the Court appropriately looked to the totality of the circumstances. *Greenspan*, 26 F.3d at 1006. The threat against the judge was certainly a relevant circumstance, but the Tenth Circuit also considered it significant that after learning of the threat, the judge in that case "accelerated the date of Greenspan's sentencing" to get Greenspan into the penitentiary system as quickly as possible, and thereafter refused to grant a continuance of the sentencing date. *Id.* The "bottom line" was that the judge "learned of an

4

apparently genuine death threat made against him and against his family under circumstances that made it quite unlikely that the threat was intended as a device to obtain a recusal. The judge obviously took the threat very seriously and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it." *Id*. at 1007.

The alleged threat in this case is less serious—and objectively so—than the one in *Greenspan*. There, "the alleged conspiracy to kill the trial judge and his family spanned several states and included a number of persons who had allegedly contributed large sums of money for the hiring of a 'hit man.'" *Greenspan*, 26 F.3d at 1005. Here, the people alleged to be a part of the threat were all in custody, and the threat is now more than two years old. Thus, it is reasonable for this court to move forward with this case and not recuse itself. *See United States v. Holland*, 519 F.3d 909, 916 (9th Cir. 2008) (no error in not recusing *sua sponte* when court did not consider threats to be serious). Additionally, there is no record that suggests that this Court is concerned with his personal safety specifically because of the Defendant.

Lastly, there has not been a showing that this Court has taken any action to date based on the threat that would raise a question about the court's impartiality.[3] This stands in contrast to the situation in *Greenspan*. 26 F.3d at 1007. *See also In re Basciano*, 542 F.3d 950, 957 n.6 (2d Cir. 2008) ("principal indicium" is whether judge's subsequent actions after learning of the threat appear impartial). Here, the Defendant cannot point to one instance in which the Court has taken any adverse action based on the threat.

---

[3] The defense is asserting that the Defendant's move from the Cibola County facility to the Luna County Detention Center was a response to the alleged threat. However, according to the USMS, Defendant has not been specifically moved because of a threat to Judge Browning.

WHEREFORE the United States respectfully requests this Court deny Defendant's Motion for recusal.

Respectfully Submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

***Electronically Filed 7/31/2023***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
RYAN G. ELLISON
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 - Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/ _____
MARIA Y. ARMIJO
Assistant United States Attorney

# **SEALED** Affidavit in Support of Search Warrants for Locations A-1 thru A-5

State/Local LE: Please note the attached application and affidavit were ordered SEALED by the Court until further notice of the Court. As such, they are not subject to New Mexico IPRA

Goverment Exhibit 1 (part 1)

**U.S. v. ROBERT PADILLA, et al., 1406**

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**SEALED**

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAR 1 2021

MITCHELL R. ELFERS
CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

See Attachment A for Locations A-1 thru A-5

```
21-MR-262
21-MR-263
21-MR-264
21-MR-265
21-MR-266
```

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of _____ New Mexico _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1962(d), 1959, 1512, 1513, 924(c), 922(g), 2, and 21 U.S.C. §§ 856, 846, and 841(a)(1). | RICO Act conspiracy; VICAR; intimidating and retaliating against a witness, victim, or informant; use of a firearm in furtherance of violent crime or drug trafficking; felon in possession of a firearm, aid and abet, maintain drug premises, conspiracy and possession with intent to distribute controlled substances. |

The application is based on these facts:

Refer to the Sealed Affidavit in Support of an Application for Search Warrants, which has been attached hereto.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan M. Acee, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **March 1, 2021**

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Karen B. Molzen, United States Magistrate Judge
*Printed name and title*

**U.S. v. ROBERT PADILLA, et al., 1407**

# Table of Contents

| | Page |
|---|---|
| SEARCH WARRANT LOCATION CHART | 2 |
| GLOSSARY OF KEY TERMS AND ENTITIES | 3 |
| TRAINING AND EXPERIENCE | 4 |
| OVERVIEW OF THE INVESTIGATION | 7 |
| PURPOSE OF AFFIDAVIT | 14 |
| BACKGROUND ALLEGATIONS RE: GANGS/DRUG TRAFFICKERS | 19 |
| THE SNM CRIMINAL ENTERPRISE | 26 |
| THE HISTORY OF THE SNM | 31 |
| VIOLENCE TARGETING GOVERNMENT WITNESSES & AGENTS | 36 |
| SNM MEMBERS MAINTAIN A STEADY SUPPLY OF WEAPONS | 46 |
| THE CONFIDENTIAL HUMAN SOURCES | 48 |
| STATEMENT OF PROBABLE CAUSE | 53 |
|     The Target Subjects | 55 |
|     Other Threat Actors | 58 |
|     The Conspiracy to Murder Government Witnesses | 62 |
|     Drug Distribution in furtherance of the SNM | 72 |
| THE SUBJECT PREMISES | 80 |
| SEARCHING FOR GANG TATTOOS | 89 |
| BIOMETRIC ACCESS TO DEVICES | 91 |
| CONCLUSION | 97 |
| REQUEST TO SEAL THIS AFFIDAVIT | 98 |
| EXHIBIT 1 | 99 |

U.S. v. ROBERT PADILLA, et al., 1408

**SEARCH WARRANT LOCATIONS**

| SUBJECT PREMISES | TARGET SUBJECTS | ADDRESS OF SUBJECT PREMISES |
|---|---|---|
| A-1 | DENNIS CHARLES ARAGON, aka: "OSO," | |
| A-2 | JOSE SANTIAGO RAMIREZ, aka: "TAZ" | |
| A-3 | VICTORIA JUANITA POHL-LUJAN | |
| A-4 | LANCE ROMAN NATSEWAY, aka: "PEE-WEE" | |
| A-5 | DOMINIC ANTHONY GUTIERREZ, aka: "GAGE" | |

U.S. v. **ROBERT PADILLA, et al., 1409**

## Glossary of Key Terms and Entities

| | |
|---|---|
| BOP | United States Bureau of Prisons. |
| Burqueños | A security threat group, comprised of street gang members from Albuquerque, who band together for protection in prison and jail. |
| Carnal | A term used by the SNM and other Hispanic gangs to mean "brother." |
| CHS | Confidential Human Source, CHS for both plural and singular. |
| Clavo | A hidden compartment or contraband item. |
| CNMCF | Central New Mexico Correctional Facility in Los Lunas, NM. |
| DACDF | Dona Ana County Detention Facility in Las Cruces, NM. |
| Drop-out | To renounce the gang, which usually includes formal debriefing with corrections staff or law enforcement. |
| DTO | Drug trafficking organization. |
| Eme | Mexican Mafia or La Eme ("M"), a California-based prison gang. |
| Fierro | A weapon, usually referencing a knife or shank. |
| Greenlight | A reference to a person or group who have been approved for violent assault or death by a gang or criminal group. |
| Hitter | A person who is able to get drugs into a correctional facility. |
| Kite | Secret message contained on a small piece of paper, also called a wela. |
| Los Carnales | A New Mexico based prison gang. |
| MDC | Bernalillo County Metropolitan Detention Center in Albuquerque, NM. |
| NMCD | New Mexico Corrections Department. |
| NMSP | New Mexico State Police. |
| OCDETF | Organized Crime Drug Enforcement Task Force. |
| Paperwork | Police reports or other discovery documents showing a person cooperated with law enforcement. |
| PNM | Penitentiary of New Mexico in Santa Fe, NM. |
| Put in work | To do something for the gang. |
| RICO | Racketeering Influenced and Corrupt Organizations. |
| Rollo | Information or a description of a particular situation (What's the rollo?). |
| RPP | NMCD's Restoration to Prison Population (gang drop-out) program. |
| SFADC | Santa Fe Adult Detention Center in Santa Fe, NM. |
| Shank | A clandestine knife or stabbing instrument. |
| Shot-caller | An influential gang leader. |
| Skina | To help out or show support. |
| SNM | Syndicato de Nuevo Mexico, a New Mexico based prison gang. |
| SNMCF | Southern New Mexico Correctional Facility in Las Cruces, NM. |
| SSGTF | FBI Safe Streets Gang Task Force |
| STG | Security Threat Group. STG officers monitor prison gangs. |
| STIU | Security Threat Intelligence Unit. STIU officers monitor prison gangs. |
| Sureños | A California based street gang. There are Sureños members in NM. |
| UCA | Undercover agent. |
| USAO | United States Attorney's Office. |
| USP | United States Penitentiary. |
| USPO | United States Probation Office. |
| Validation | The process used by prison officials to recognize and designate an inmate as a member of a gang. Not all gang members have been validated. |
| VCTF | FBI Violent Crime Task Force. |
| VICAR | Violent Crime in Aid of Racketeering. |
| Wesos | Spanish for "bones." Gang members can earn their wesos by putting in work. |

U.S. v. ROBERT PADILLA, et al., 1410

## SEALED AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Bryan M. Acee, being duly sworn, do hereby depose and state as follows:

### TRAINING AND EXPERIENCE

1.        I am a Special Agent with the FBI and am recognized as a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.  I have been a sworn law enforcement officer for 21 years, serving as a police officer, detective, task force officer and Special Agent. I have been with the FBI since 2009 and currently serve as the Coordinator of the Albuquerque Violent Crime Task Force (VCTF),[1] where I primarily investigate violent repeat offenders and federal drug and firearm related crimes. Prior to my assignment to the VCTF, I served on the FBI Safe Streets Gang Task Force (SSGTF) in Albuquerque, New Mexico, and the FBI-DEA Hybrid Cross Border Drug Violence Squad in Las Cruces, New Mexico. I was the lead case agent in the government's 2010-2014 Continuing Criminal Enterprise Drug Kingpin Act case against the Juarez Cartel, which resulted in extensive seizures of controlled substances, currency, firearms, and the indictment of multiple cartel leaders.

---

[1]  The VCTF is an FBI-sponsored task force comprised of investigators from the FBI, Drug Enforcement Administration, New Mexico State Police, Albuquerque Police Department, Bernalillo County Sheriff's Office and Valencia County Sheriff's Office. The VCTF primarily focuses on violent repeat offenders engaged in federal firearm or drug related crimes.

U.S. v. ROBERT PADILLA, et al.,  1411

2.     In March 2015, I initiated a gang-racketeering investigation into the illegal activities of the New Mexico Syndicate, more commonly referred to as the "Syndicato de Nuevo Mexico" or "SNM." I continue to serve as the lead case agent in the government's on-going Racketeer Influenced and Corrupt Organizations (RICO) Act case against the SNM, which has focused on the members, associates, and other support elements that facilitate criminal activities at the direction of the SNM.

3.     To date, more than 150 SNM members and associates have been arrested as a result of this investigation. The majority of the defendants were charged federally and most have been convicted. Over the course of the investigation, I have interviewed more than 100 gang members affiliated with the SNM (including current and former SNM leaders) regarding the various aspects of the organization.

4.     Over the past 21-years, I have primarily worked investigations pertaining to gangs and drug trafficking organizations (DTOs). I have interviewed hundreds of gang members and drug traffickers about the various aspects of their criminal activities. I have developed and managed numerous informants who have been members of gangs or DTOs and monitored dozens of wiretaps and electronic surveillance recordings targeting gang members or drug distributors. I have also worked in an undercover capacity to infiltrate such criminal organizations.

5.    I have received hundreds of hours of formal training in the area of gang, drug, and organized crime investigations from federal, state, and local law enforcement agencies. I've participated in hundreds of investigations pertaining to drug distribution, money laundering, firearms trafficking, gangs and criminal enterprises. My investigative experience includes: conducting surveillance; interviewing subjects, targets and witnesses; drafting and executing search and arrest warrants; acting in an undercover capacity; supervising cooperating sources; managing undercover agents; issuing subpoenas; analyzing phone records, financial records, telephone tolls, and Title III and consensual wiretap investigations. Through my training and experience, I am familiar with the methods and means used by individuals, DTOs, gangs, and criminal enterprises to distribute controlled substances. I am also familiar with how those individuals and organizations hide the often substantial profits generated from their criminal activities.

6.    I have qualified, in federal and state courts, as an expert witness on drug trafficking and possession of drugs with intent to distribute. I have qualified in federal court as an expert witness on the Juarez Cartel and I am an FBI subject matter expert on the SNM prison gang and the Juarez Cartel.

7.        I have served as an adjunct professor; law enforcement instructor; and presenter on drug and gang investigations at the California Highway Patrol, Los Angeles Police Department, New Mexico State Police and Bernalillo County Sheriff's Office Academies; as well as at training classes and seminars for the Organized Crime Drug Enforcement Task Force, International Outlaw Motorcycle Gang Investigator's Association, California Narcotic Officer's Association, California Gang Investigator's Association, New Mexico Gang Task Force, New Mexico State University, and University of New Mexico.

## OVERVIEW OF THE INVESTIGATION

8.        The FBI, New Mexico Corrections Department (NMCD), New Mexico State Police (NMSP), Bernalillo County Sheriff's Office (BCSO) and United States Attorney's Office (USAO) for the District of New Mexico have been engaged in the investigation of the ultra-violent SNM prison gang for the past six years. The SNM is New Mexico's largest gang and it has historically controlled the majority of New Mexico's prisons and Hispanic street gangs. The SNM was formed in the wake of the deadly 1980 Santa Fe prison riot, in which thirty-three inmates were murdered and fourteen correctional officers were taken hostage, beaten, and sexually assaulted. Following the prison riot, the SNM expanded throughout the New Mexico penal system and bolstered hundreds of members.

Over the past thirty years, SNM members have murdered four New Mexico police officers.[2]

9.      The investigation into the SNM began in March 2015, when SNM leaders ANTHONY RAY BACA, aka "PUP," ROBERT MARTINEZ, aka "BABY ROB," and ROY MARTINEZ, aka "SHADOW," called for the murder of the cabinet secretary of the NMCD and two high-level supervisors within the NMCD's Security Threat Intelligence Unit (STIU). The threat culminated in late 2015, when ANTHONY RAY BACA directed CHRIS GARCIA, a member on the street, to obtain firearms and murder the NMCD officials or their families. CHRIS GARCIA acquired two firearms and provided a handgun to a second SNM member, an FBI informant, to be utilized in the murder of the cabinet secretary. A third member of the gang, MANDEL LON PARKER, aka "CHUCO," agreed to assist with the murders, but unbeknownst to him, CHRIS GARCIA instructed the FBI informant to kill MANDEL PARKER after the "mission" was complete, because CHRIS GARCIA did not trust MANDEL PARKER.

10.     The investigation was further predicated by the fact the SNM had a decades long history of murder, kidnapping, extortion, drug trafficking, aggravated assault and other violent crimes. The investigation was subsequently designated United

---

[2] Mesilla Marshal's Office Sergeant Thomas Richmond (1988), Albuquerque Police Sergeant Cheryl Tiller (1998), Bernalillo County Deputy James McGrane (2006) and Rio Rancho Police Officer Nigel Benner (2015).

**U.S. v. ROBERT PADILLA, et al., 1415**

States Department of Justice Organized Crime Drug Enforcement Task Force (OCDETF) investigations, titled "Operation Atonement" and "Operation Atonement II."

11.      While the investigation remains active, I am able to attest to the fact the FBI was able to thwart the murder plot directed at the NMCD officials and arrest the conspirators. Moreover, I believe our investigative actions and criminal prosecutions have deeply disrupted the gang's criminal activities. Much of the disruption was accomplished through the implementation of various undercover and advanced investigative techniques, to include:

   a) 106 undercover drug and firearm buys from SNM members/associates;

   b) 52 confidential human sources developed within the gang and utilized operationally;

   c) 9 court-authorized wire intercepts with 11 extension orders, two of which were deployed within the maximum-security prison in Santa Fe, New Mexico;

   d) 11 pen register/trap and trace orders to locate SNM fugitive ANGEL DELEON in Mexico;

   e) Approximately 455 hours of electronic surveillance recordings of gang meetings and conversations;

   f) 10 homicides solved and charged as RICO Act conspiracy and/or Violent Crimes in Aid of Racketeering (VICAR);

g) RICO Act conspiracy charges comprised of more than 325 overt acts committed by members of the SNM.

12.     The six year investigation was segmented into separate phases, which encompassed investigative efforts, four separate takedown operations, extensive trial preparation and motions hearings; three separate racketeering jury trials, tracking and arresting fugitive SNM member ANGEL DELEON in Mexico, and the continued proactive monitoring of the gang by law enforcement and corrections officials. There are a few jury trials and sentencing hearings that are pending. A brief overview of the four prior phases of the operation follows:

13.     **The Phase I Takedown:** In December 2015, forty SNM members and associates were indicted on federal racketeering, drug, and firearm charges within the District of New Mexico. Shortly thereafter, multiple FBI Special Weapons and Tactics (SWAT) teams deployed around the state and executed forty-six federal search warrants. Contemporaneous with the service of the search warrants, five NMCD prisons around the state were placed on lock-down and all SNM inmates within the prisons were searched. In addition, fifty-five SNM members on state parole or probation were contacted and searched by NMCD officers and law enforcement. The prison shakedowns and probation/parole searches yielded additional arrests, interviews, and intelligence information.

14.     In the months that followed the Phase I Takedown, case agents arrested several additional SNM members and associates via criminal complaints for VICAR homicide; firearm violations; tampering with and retaliating against a witness, victim, or an informant; possession with intent to distribute controlled substances; and conspiracy to distribute controlled substances.

15.     **The Phase II Takedown:** In April 2016, FBI agents and federal prosecutors presented additional evidence to a federal Grand Jury and obtained two supplementary indictments against thirty-nine additional members and associates of the SNM. The two indictments incorporated twenty-two counts of RICO Act conspiracy; VICAR (murder, attempt murder, conspiracy to commit murder, assault with a deadly weapon resulting in serious bodily injury and conspiracy to commit assault with a deadly weapon resulting in serious bodily injury); being a felon in possession of a firearm; using or carrying a firearm during and in relation to a crime of violence; and aiding and abetting. FBI agents arrested dozens of SNM members and associates during the Phase II takedown.

16.     **The Phase III Takedown:** In September 2016, FBI agents served twelve federal search warrants on SNM members believed to be plotting to disrupt the government's investigation by murdering witnesses and informants. Case agents also developed information indicating SNM members had discussed killing FBI agents and federal prosecutors. Select SNM members in the BOP and

NMCD prisons were also searched. During the service of the Phase III search warrants, FBI agents seized twelve firearms from residences in Albuquerque and arrested several subjects.

17.     **The Phase IV Takedown:** On July 22, 2019, government witness LEROY LUCERO, aka "SMURF," a former leader within the SNM, was murdered by armed assailants in the driveway of his residence in Las Vegas, New Mexico. FBI case agents joined the Las Vegas, NM, Police Department, New Mexico State Police, and the San Miguel County District Attorney's Office to investigate the homicide. The Lucero homicide investigation was linked to a DTO being investigated by the DEA. The FBI and DEA case agents combined resources and conducted a joint-investigation. On September 19, 2019, the FBI and DEA, with assistance from state/local law enforcement, executed 27 federal search warrants and 24 federal arrest warrants in Albuquerque, Santa Fe, Española, Las Vegas, and Wagon Mound, NM. A total of 33 arrests were made and 57 firearms were seized. Substantial leads in the LUCERO homicide were developed and the investigation is nearly complete.

18.     Between July 2019 and the present date, several additional SNM members have been arrested for armed robberies of businesses, armed robberies of drug dealers, unlawful firearms possession, and drug trafficking.

19.     To date, more than 120 SNM members and associates have been charged with federal violations. Nearly half of the

defendants were charged with federal racketeering (VICAR/RICO) violations, and the majorities of these defendants pled guilty or were convicted. I believe it noteworthy to mention that although the SNM was deeply entrenched in the New Mexico prison system, seventy-percent (70%) of the defendants arrested thus far were out-of-custody (or on the street) at the time of their arrest. Based on my investigation, I believe the SNM yields considerable power and influence on the street and in prison.

20. **The Present-Day Status of the Investigation:** The FBI continues to monitor the SNM and target certain members for prosecution, based on their relentless commitment to criminal activity. The United States, through its investigative team, has become aware of grave threats directed at several government witnesses and cooperating defendants in the United States' case against the SNM. Moreover, I am aware certain members of the gang have advocated for FBI agents, federal prosecutors, and the presiding federal judge to be harmed. I believe the requested search warrants will yield evidence of such a plot, as well as an ongoing conspiracy by members and associates of the SNM to distribute controlled substances.

21. Probable cause for these warrants is based on information from four confidential sources within the SNM and corroborated by my knowledge of the SNM. I believe all four informants utilized in this affidavit to be reliable based on

corroboration, as detailed herein. Moreover, I recognize their cooperation with the government is a serious betrayal to the SNM and grounds for execution by the SNM, should their identities be revealed. My assertion that the SNM will kill informants, suspected informants, or those who betray the gang, is not grounded in theory or assumption. Rather, I am aware the SNM has killed such persons, who they regard as traitors, on numerous occasions and will provide several examples of such conduct in the pages that follow.

## PURPOSE OF THE AFFIDAVIT

22.     Over the past several weeks, case agents have become aware of numerous threats aimed at government witnesses, federal prosecutors, FBI agents, and the presiding federal judge in the United States' case against the SNM.  Based on my review of reporting from law enforcement, probation/parole officers, corrections officials, physical surveillance, multiple Confidential Human Sources, and my knowledge and experience concerning the modus operandi of the SNM, I believe the threats are being perpetrated by members and associates of the SNM.

23.     More specifically, case agents have reason to believe **FRANKIE GALLEGOS, aka: "FRANKIE G," aka: "CUNTE;" SAMUEL SILVA, aka: "RABBS;" SHAWN HENRY URAL, aka "SHAWN SHAWN;" ROBERT DEHERRERA, aka "WESOS;" HERMAN MICHAEL ORTIZ, aka: "BABY FACE;" DENNIS CHARLES ARAGON, aka: "OSO;" VICTORIA JUANITA POHL-LUJAN;**

JOSE SANTIAGO RAMIREZ, aka: "TAZ;" LANCE ROMAN NATSEWAY, aka: "PEE-WEE;" DOMINIC ANTHONY GUTIERREZ, aka: "GAGE;" and others, are conspiring to locate and murder a former SNM leader turned government witness. The aforementioned subjects are believed to be engaged in a plan to monitor the public parking lots and pedestrian foot traffic around the federal courthouse in Albuquerque during the month of March 2021. The purpose of the courthouse surveillance is purportedly to locate the former gang leader and follow him away from the courthouse so they can murder him. I believe the requested search warrants will yield evidence of such a plot.

24.     Because the FBI is not ready to disclose the identity of several highly placed informants, the FBI is not seeking arrest warrants for the conspirators at this time. Rather, I am pursuing a far less intrusive method, that is, search warrants for the conspirator's premises to search for specific evidence of a conspiracy to murder and/or harm victims, witnesses, informants, perceived informants, agents, attorneys, and/or court staff.

25.     Defendants DENNIS CHARLES ARAGON, aka: "OSO;" VICTORIA JUANITA POHL-LUJAN; JOSE SANTIAGO RAMIREZ, aka: "TAZ;" LANCE ROMAN NATSEWAY, aka: "PEE-WEE;" and DOMINIC ANTHONY GUTIERREZ, aka: "GAGE;" are also suspected of participating in an ongoing conspiracy to distribute controlled substances in furtherance of the SNM's objectives and purposes. I believe the drug distribution scheme is dependent on the strength, influence,

and reputation of the SNM and the street gangs that support the SNM.

26.    Based on the evidence obtained in this investigation, and as described herein, I believe there is probable cause to believe the physical properties associated with the individuals **DENNIS CHARLES ARAGON, aka: "OSO;" VICTORIA JUANITA POHL-LUJAN; JOSE SANTIAGO RAMIREZ, aka: "TAZ;" LANCE ROMAN NATSEWAY, aka: "PEE-WEE;"** and **DOMINIC ANTHONY GUTIERREZ, aka: "GAGE,"** (collectively, the "Target Subjects") contain evidence of various forms of federal criminal activity. As such, this affidavit is submitted in support of search warrants for evidence, fruits, and instrumentalities of violations of:

a) 18 U.S.C. § 1962(d) RICO Act conspiracy;

b) 18 U.S.C. § 1959 VICAR;

c) 18 U.S.C. § 1512 Tampering with a witness, victim, or an informant;

d) 18 U.S.C. § 1513 Retaliating against a witness, victim, or an informant;

e) 18 U.S.C. § 924(c) Use of a firearm in furtherance of a crime of violence or drug trafficking crime;

f) 18 U.S.C. § 922(g) Prohibited person in possession of a firearm or ammunition;

g) 18 U.S.C. § 2 Aiding and abetting;

h) 21 U.S.C. § 856 Maintaining drug-involved premises;

     i) 21 U.S.C. § 846 Conspiracy to distribute controlled substances; and

     j) 21 U.S.C. § 841(a)(1) Possession with intent to distribute controlled substances.

27.     Hereinafter I will refer to the aforementioned violations as the "Target Offenses."

28.     The specific premises to be searched have been described in Attachment A, which has been attached hereto and incorporated herein by reference, and are collectively referred to as the "Subject Premises." The particular evidence, fruits, and instrumentalities to be seized by law enforcement are set forth in Attachment B, which has been attached hereto and incorporated herein by this reference.

29.     This affidavit also seeks the Court's permission to allow the FBI agents executing the search warrants to search the bodies of the <u>male</u> Target Subjects for tattoos evidencing membership in or association with the SNM, to include support gangs such as the San Jose, Eastside Locos, 18th Street, 14th Street, Valley Gardens, Brew Town, El Washe, Barelas and other street gangs, and to photograph those tattoos. I believe such tattoos may constitute a conspiratorial overt act and have utilized such photographic evidence during gang-RICO jury trials in the past.

30.     I am submitting this affidavit based upon my experience and familiarity with the investigation of the SNM. This

affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information. During my investigation, I have developed information I believe to be reliable from the following sources:

a) Information provided by the FBI, DEA, USMS, BOP, NMCD, U.S. Probation Office (USPO), and other law enforcement or corrections officials (also referred to herein as "agents"), including oral and written reports;

b) Results of physical surveillance;

c) Information provided by undercover agents and informants;

d) Information derived from consensually recorded conversations;

e) Information provided by cooperating defendants and/or the defense attorneys representing those persons;

f) Information derived from lawfully intercepted wire communications, to include telephone, text, email, and video; and

g) Records from the FBI National Crime Information Center (NCIC), U.S. District Courts, New Mexico Courts, and the New Mexico Motor Vehicle Division.

31.     Where I refer to conversations herein, they are related in substance and, in part, based on conversations between fellow agents, task force officers, other law enforcement personnel, or confidential human sources that assisted law enforcement. Any observations referenced herein that I did not personally witness were relayed to me in oral and/or written reports by agents of the FBI or other agencies. All figures, times, and calculations set forth herein are approximate. Unless otherwise specified, weights of controlled substances are approximate and are based on gross measurements.

**BACKGROUND ALLEGATIONS REGARDING GANGS AND DRUG TRAFFICKERS**

32.     Based upon my training, experience, and participation in the SNM investigation, as well as the investigation of other gang/criminal enterprises and DTOs, I am aware of the following information:

h) Individuals engaged in the type of criminal conduct constituting the Target Offenses (RICO Act conspiracy; VICAR; providing contraband to a federal prisoner; tampering with or retaliating against a witness, victim, or informant; use of a firearm in furtherance of a crime of violence or a drug trafficking offense; being a felon in possession of a firearm or ammunition; aiding and abetting; and conspiracy and distribution of

**U.S. v. ROBERT PADILLA, et al,  1426**

controlled substances) maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence includes: telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

i) Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain regular contact with one another. This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises routinely send and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include financial help and/or witness intimidation or elimination (as is the

case in the instant investigation). Incarcerated members of gang/criminal enterprises communicate via telephone calls, some of which are generated via third parties. In addition, incarcerated members often keep photographs of themselves and other members of the gang/criminal enterprise in order to impress or intimidate others.

j) Members of the SNM, and the street gangs that support the SNM, such as the San Jose, Westside Locos, 18th Street, 14th Street, Valley Gardens, Brew Town, El Washe, Barelas and other street gangs, aggressively pursue informants, suspected informants, and persons who betray the SNM. I am aware the SNM relays such information to one another through covert communications, messages, emails, telephone calls, personal visits, letters, and mail disguised as "legal mail." SNM members and associates send controlled substances to inmates disguised as legal mail. The instruments used to create fictitious and fraudulent legal mail include letters, writings, envelopes, stamps, labels, printing devices, or markings used to create such packages.

k) I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang

**U.S. v. ROBERT PADILLA, et al., 1428**

members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I have observed incarcerated members of gang/criminal enterprises utilize non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood STIU or STG officers will monitor the call.

l) In addition, I am also familiar with the use of text messaging, instant messaging, and messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement. I am aware NMCD and BOP inmates are able to utilize email services while

incarcerated and believe those services are widely used by the inmates.

m) Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in containers on their property.

n) Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and

co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy or electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

o) Individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

p) I am aware that members of the SNM use, possess, and conceal bladed and/or blunt weapons; such as knives, shanks, razor blades, metal pipes, metal fittings, edged weapons; and firearms; to include rifles, shotguns, and handguns. These weapons are used and possessed by members of the gang to commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and persons who have betrayed the SNM, to impose discipline within the gang, and for other violent crimes. I know that firearms are instrumentalities of the crime of drug trafficking and that firearms are critical "tools of the trade" for the SNM. Members and associates of the SNM are expected to possess and maintain weapons and firearms. I am aware members of DTOs often possess firearms to protect their drug supply and proceeds.

q) The items described above are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

## THE SNM CRIMINAL ENTERPRISE

33.	The SNM, including its leadership, membership, prospects, and associates, constitutes an enterprise as defined in 18 U.S.C. § 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which, affect interstate commerce. The enterprise constitutes an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

34.	I am aware that members and associates of the SNM commit, conspire, attempt, and threaten to commit acts of violence to protect and expand the enterprise's criminal operations and reputation.  Historically, the SNM generated income by distributing controlled substances, extorting weaker drug dealers, and participating in robberies and burglaries. To maintain the SNM criminal enterprise, members of the gang discuss:

a) the membership, rules (which the SNM refer to as "reglas"), and enforcement of the rules;

b) the status of SNM members and associates;

c) the discipline of SNM members;

d) encounters with law enforcement;

e) the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and

**U.S. v. ROBERT PADILLA, et al., 1433**

f) plans and agreements regarding the commission of future crimes, including murder, assault, robbery, drug distribution, possession of weapons and firearms, as well as ways to conceal these crimes.

35.     With regard to the possession and concealment of weapons and firearms, I am aware members of the SNM, and the street gangs that support the SNM, use, possess, and conceal bladed and/or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, and similar weapons when incarcerated. Similarly, SNM members on the street use, possess, and conceal firearms and edged weapons. These weapons are used and possessed by members of the gang to commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and members or associates who have betrayed the SNM, to impose discipline within the gang, and for other criminal activity. I have arrested several SNM members and associates for:

a) murder in aid of racketeering;

b) using and carrying a firearm during and in relation to a crime of violence;

c) assault with a dangerous weapon in aid of racketeering; and

d) possession of firearms, or ammunition, by a convicted felon.

36.    I am aware the vast majority of the SNM members are convicted felons, as supported by the fact the SNM criminal enterprise is a prison gang, comprised primarily of state or federal inmates, or former inmates.

37.    I am aware the SNM maintains separate, but related, hierarchies within the NMCD (state) prisons and the BOP (federal) facilities. The majority of the SNM membership was historically confined to the NMCD prisons; however, dozens of members are serving time in the BOP or are on federal supervised release. With the federal convictions of scores of SNM members, their presence within the BOP has increased.

38.    An SNM member can be considered a "state" or a "fed" member, and those terms are used to describe where the individual member "earned his bones" or was "made" a member – that is, performed criminal acts that displayed fidelity to the mission and interests of the gang. The terms may also describe where the member served the majority of his time as a member of the gang. I have observed some members to be proud of the fact they represented the gang in both structures.

39.    Communication between the state and federal SNM members is crucial in order to relay orders from gang leaders; communicate gang truces or wars; share information on members and their locations within the prison system, particularly the recruitment of new members and disavowing of members; inmate

release dates; the identity of suspected informants; money transfers; and the ever present distribution of controlled substances; as well as other information. Communication between the state and federal SNM members has increased dramatically, which is not surprising given the large number of SNM members recently sentenced to the BOP. The SNM, like other prison gangs, maintains a tenuous presence within the BOP, and a significant increase, or decrease, of incarcerated members can impact "prison politics" or the balance of power among the prison gangs. The influx of SNM members into the BOP will likely give rise to the SNM's footprint within the federal prisons. I am aware SNM member SAMUEL SILVA, aka: "RABBS," killed a fellow inmate at the United States Penitentiary (USP) Lee in Virginia, on or about September 14, 2018. I believe the "hit" had been sanctioned by the powerful Mexican Mafia prison gang[3] and resulted in a favorable image for SAMUEL SILVA and the SNM, as the victim is believed to have been on a "greenlight" list. SAMUEL SILVA was charged with a federal homicide as a result of the 2018 incident.

---

[3] The Mexican Mafia, also known as La Eme (Spanish: "M") or The Black Hand, is a highly organized Mexican American prison gang in the United States. California and U.S. Bureau of Prison officials report that the Mexican Mafia is the most powerful gang within the California and U.S. prison systems. Nearly 2,400 California Sureños in the BOP take orders from the Mexican Mafia. Source: FBI National Gang Intelligence Center and U.S. Bureau of Prisons.

40.      I know that the federal SNM members have peace treaties with some of the prison gangs within the BOP. As such, the federal members of the SNM will need to educate their incoming "brothers" on the proper ways and mechanisms within the BOP. One potentially disastrous scenario for the SNM would be for the gang to have informants or cooperators among the ranks of the incoming members. In order to maintain power within the federal prisons, I believe the SNM will need to remain organized, dedicated to their mission, and rid themselves of informants and weak members.

41.      The SNM has long sought to bring all of the New Mexico-based, Hispanic street gangs under their control, much like the Mexican Mafia prison gang has done with the California Sureños street gangs.[4] I believe the SNM's unification of the street gangs is needed to enhance the SNM's presence inside the prisons and counter the growth of rival prison gangs.

42.      In summary, I believe the SNM exists almost exclusively to engage in racketeering activity. Generally speaking, it has been my observation that SNM-generated crimes are

_____

[4] Sureños (Spanish: Southerners) Sur 13 or Sureños X3 are groups of affiliated Hispanic gangs that pay tribute to the Mexican Mafia while in state and federal correctional facilities. The Sureños' originated in southern California and that region remains its stronghold, although gang officers in Arizona, New Mexico, and Nevada report a large presence of Sureños gangs in their regions. Sureños have emerged as a national gang in the United States. Source: FBI National Gang Intelligence Center and U.S. Bureau of Prisons.

not random, SNM members do not act alone, SNM affairs are widespread within the prison/jail system and on the street, and SNM members engage in criminal activity for sustained periods of time. I believe the SNM has historically engaged in a wide variety of crimes; however, I consider the SNM to be most proficient at murder and smuggling drugs into prison.

### THE HISTORY OF THE SNM

43.     The SNM was formed at the Penitentiary of New Mexico after a prison riot in February 1980. During the prison riot, fourteen correctional officers were taken hostage and several of them were seriously assaulted and raped by inmates. Thirty-three inmates were killed during the riot, and more than two hundred were injured. The majority of inmates killed were perceived to be "rats" or informants.

44.     Following the prison riot, the SNM expanded throughout the New Mexico penal system and has bolstered more than 500 members since the early 1980s. NMCD officials estimated the SNM is currently comprised of at least 400 active members, who were known as "hermanos," "brothers," "carnales," "dons," "jefes," "big homies," or "Zia manos."

45.     Despite being imprisoned and closely scrutinized by prison officials and the FBI, SNM leaders still manage to convey their orders to gang members and associates throughout the prison

system and outside the prison system through a variety of means, including contraband cellular telephones, secret notes called "kites" or "welas," coded letters, and messages conveyed by complicit visitors.[5] When SNM members or associates complete their sentences and rejoin their communities, they are expected to remain loyal to the SNM and work to further the goals of the SNM outside the prison environment.  One of the significant goals of the SNM is to control and profit from drug trafficking inside the penal system and on the street.

46.    In addition to exerting its control in the NMCD and BOP, the SNM also operates on the streets of New Mexico by intimidating and influencing smaller New Mexico Hispanic gangs for the purpose of establishing a larger network for the SNM's illegal activities.  If a gang does not accede to the SNM, the SNM will assault or kill the gang's members who are not in custody as well as those members who are incarcerated within the NMCD or county jails.  In addition to intimidation through direct assaults, the SNM is also able to assert control and influence over gang members outside the prison walls because gangs do not want their members outside the penal system to be assaulted or killed, and because

---

[5]The SNM utilizes female family members and girlfriends to pass messages to other members of the gang.  Female associates and family members have also been used to smuggle drugs into prison facilities on behalf of the SNM.

the gang members know that, if they are incarcerated, they may encounter SNM members while they serve their sentences.

47.     In years past, the SNM engaged in a violent war with rival prison gangs, to include the Aryan Brotherhood, Barrio Azteca, Burqueños, and Los Carnales. I believe the SNM currently maintains peace treaties with the Aryan Brotherhood and Los Carnales; however, the SNM remains in conflict with the Burqueños and all Texas-based prison gangs, to include the Barrio Azteca and Texas Syndicate. Within the prison system, this rivalry manifests itself in beatings and stabbings, which often result in death. Outside the prison system, the SNM fights for control of territory in which to conduct narcotics trafficking and other crimes, as well as to recruit and influence non-gang members. In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching members, the SNM also engages in violence simply to assert its gang identity, to claim or protect territory, to challenge or respond to a challenge, to retaliate against a rival gang or member, to gain notoriety, and show superiority over others. I have heard from numerous SNM members they believe the gang's greatest legacy is its reputation as an ultra-violent organization.

48.     The SNM strives to have a reputation for being strong and powerful and must maintain its membership to continue functioning as an organization in prison and on the streets. If

the SNM is perceived as being weak, then rival gangs could challenge and assault its members and take over its territory. This could cause the SNM to lose membership and eventually dissolve. If the SNM maintains a large membership and a reputation for being dominant, rival gangs may think twice before they challenge it. Similarly, victims and witnesses may think twice about assisting authorities with any prosecution attempt against the gang. I have encountered potential witnesses and victims who were too afraid to speak with law enforcement and much less willing to testify against the SNM.

49.     A member of the SNM is expected to seek out and beat, stab, or shoot rival gang members. Similarly, a member of the SNM is expected to confront and attack suspected law enforcement informants and sex offenders. Such opportunities are referred to as "smash on sight."

50.     SNM members identify themselves with the Zia symbol and the letters "SNM" or "S." The SNM members also utilize the numbers "19," which represents the 19th letter of the alphabet, "S," and "505," which corresponds with the area code for the greater Albuquerque area.  The SNM claims the entire state of New Mexico as its territory, which is broken up by four geographical regions: North, South, East and West.  SNM members display these numbers, letters, and symbols in tattoos, graffiti,

drawings, and on clothing as a way of displaying their affiliation, loyalty, and commitment to the SNM.

51.     Only men can be members of the SNM.[6] The term "Zia Lady" is used by the SNM to describe highly respected and influential female associates of the gang.

52.     SNM members frequently commit "branded" criminal acts, in other words, they commit crimes in the name of the gang. Examples of branded criminal acts include: gang members shouting references to SNM before or during a crime; gang members demanding property or services because of their membership; and gang members killing or attempting to kill members of rival gangs. SNM members have been known to kill or attempt to kill law enforcement officers as well (see footnote 2 for additional details).

53.     Weapons, to include blunt force and edged weapons, and firearms, to include handguns, rifles, and shotguns, are important tools of the trade and instrumentalities of the SNM.

54.     SNM members operate under a "blood in, blood out" philosophy, which prohibits them from dropping out of the gang. The term "blood in, blood out," means a prospective member must assault or kill a person to gain entrance into the gang, and the

---

[6] The NMCD has identified some female inmates as suspected members of the SNM; however, I do not believe a female can be a "suspected" or "validated" (the two classifications NMCD designates gang members) SNM member. My belief is based on my interviews of more than fifty validated members of the SNM, to include leaders and founding members of the gang.

only way out is death. A prospective member of the SNM must be sponsored by at least three SNM members, who "raise their hand," or vote-in the prospect.

55.     Members who are in "bad standing" within the gang are put on a "greenlight" list, which means they are to be assaulted or killed by other members of the gang. If a member is to be killed by the gang, the responsibility often falls on the senior member(s) that sponsored, or brought, that member into the gang. Similarly, if a leader is put on the greenlight list, then the younger members who were brought in by that leader may be asked to take out the leader.

56.     SNM members are forbidden to speak with law enforcement officials and to do so may result in the SNM member's violent death at the hands of his fellow gang members, as was the case on multiple occasions in this investigation.

## VIOLENCE TARGETING GOVERNMENT WITNESSES AND AGENTS

57.     Over the course of this investigation, I have become aware of several instances in which members or associates of the SNM have threatened or conducted violent acts aimed at victims, witnesses, case agents, federal prosecutors, and informants (to include suspected informants).

58.     The FBI refers to its informants as confidential human sources (hereinafter "CHS" for both plural and singular).

Some of the examples of violence targeting victims, witnesses, agents, attorneys and CHS follow:

59.     <u>Example 1</u>:  In February 2016, during a recorded telephone call, a CHS, who was a member of the SNM, spoke with SNM member CARLOS HERRERA, aka: "LAZY," and HERRERA's mother, who was a long-time heroin dealer and prior target of Operation Atonement. The CHS attempted to order heroin from CARLOS HERRERA's mother. CARLOS HERRERA and his mother became suspicious of the CHS and subsequently declined to sell heroin to the CHS. A few days later, the CHS was shot several times by a street gang member with family ties to the SNM.  It should be noted the CHS was utilized in the Operation Atonement Phase I takedown operation, which resulted in the arrest of dozens of SNM members and associates.

60.     <u>Example 2</u>:  In February 2016, SHAUNA GUTIERREZ, the girlfriend of SNM member JOE LAWRENCE GALLEGOS, had SNM member PAUL RIVERA, aka: "OSO," and SNM associates BRANDY RODRIGUEZ, aka: "WEDA," and SANTOS GONZALEZ assault victim J.G. At the time of the assault, J.G had agreed to cooperate with the Valencia County Sheriff's Office in an aggravated battery prosecution against JOE LAWRENCE GALLEGOS. The assailants beat J.G. with clubs and a machete, and told J.G. the assault was due to the fact J.G. was scheduled to testify against JOE LAWRENCE GALLEGOS. During the attack, J.G. was struck in the head with the machete at least two times and suffered serious bodily injuries.

**U.S. v. ROBERT PADILLA, et al,  1444**

61.     Example 3: In March 2016, SNM member CARLOS HERRERA, aka: "LAZY," was overheard on a covert FBI recording device, located within a prison facility, talking to other SNM members about killing FBI agents and blowing up a federal building, due to the FBI's investigation of the SNM.

62.     Example 4: In March 2016, SNM member CARLOS HERRERA, aka: "LAZY," was overheard on a covert FBI recording device, located within a prison facility, talking to other SNM members about killing informants and anyone else that cooperated with the FBI.

63.     Example 5: In March 2016, the brother of a CHS was shot by suspected members of the SNM in Dona Ana, New Mexico, and the family of the CHS reported they were threatened by members of the SNM.

64.     Example 6: In April 2016, SNM member ARTURO GARCIA, aka: "SHOTGUN," who had been charged with murder in aid of racketeering and RICO conspiracy, communicated to a cooperating witness, the names of persons who were on the SNM's "green light" list. The list included several employees of the NMCD, various jail staff members, and several cooperating defendants.

65.     Example 7: In June 2016, SNM member SAMUEL SILVA, aka: "RABBS", who was facing federal carjacking and firearms charges, solicited a CHS to locate and murder two civilian victims before his federal trial began. SAMUEL SILVA provided the CHS with

the names, addresses, and photos of the victims. Prior to requesting the CHS's assistance, SAMUEL SILVA requested another SNM member to murder his victims; however, that member was arrested on RICO conspiracy charges during the Phase II takedown operation.

66.     Example 8: In July 2016, a cooperating defendant, who was a member of the SNM incarcerated with other SNM members, reported several members were trying to get close to former SNM leader, who had pled guilty to VICAR charges, so they could murder him.

67.     Example 9: In August 2016, SNM leaders called for a meeting among SNM members (state and federal) on the street, to re-organize the gang and "hit" certain informants and witnesses that were suspected of cooperating with the FBI. The threat was mitigated when the FBI executed twelve federal search warrants on suspected conspirators and recovered twelve firearms during the Phase III takedown operation.

68.     Example 10: In August 2016, correctional officers at the Torrance County Detention Center in Estancia, New Mexico, found three shanks in the SNM pod where several SNM racketeering defendants were being held. Subsequent cooperating defendants, who were in the pod at the time, reported the shanks were to be utilized to hit fellow SNM members who were suspected of cooperating with the FBI.

69.     Underline Example 11: In December 2016, an SNM member who had been charged with murder in aid of racketeering, decided to cooperate and debriefed with the government. The cooperating defendant had been housed with the other SNM defendants in the pending RICO cases and related the SNM wanted to hit, "Acee (Special Agent Bryan Acee) or Armijo (Assistant U.S. Attorney Maria Armijo) because they're the lead agent and prosecutor." The cooperating defendant went on to say, "but anyone on the team would work" and explained the SNM wanted to hit the government to "get revenge and to demonstrate the power of the SNM."

70.     Example 12: In January 2017, an SNM member who was incarcerated in the NMCD for first degree murder was debriefed by the government. The SNM member was the highest-ranking member of the SNM at the Southern New Mexico Correctional Facility in Las Cruces, New Mexico, at the time. During the interview, the SNM member said the SNM wanted to hit an FBI agent, prosecutor or judge if the opportunity presented itself, due to the RICO prosecution of the gang.

71.     Example 13: In October 2017, an SNM member who had been charged with murder in aid of racketeering, agreed to cooperate with the government. The cooperating defendant, who was in the USMS cell block at the federal courthouse, surrendered two shanks to case agents. The cooperating defendant had carried both shanks in his rectum on each prior trip to the courthouse and had

sat in the courtroom with them. The cooperating defendant said he had intended to hit a cooperator(s), if given the chance.

72.     I am aware at least four other SNM defendants possessed shanks while in the courtroom, because officials subsequently recovered the weapons or those defendants ended up cooperating and admitting such.

73.     Example 14: In July 2018, a government witness who was incarcerated at the PNM North facility received a threatening communication. The witness previously testified as a witness in all three racketeering trials against the SNM. The government witness received a sack lunch with his name and prison cell written on the bag. Inside the bag, the witness discovered a "kite" (a small clandestine note or letter passed from inmate-to-inmate) located between two pieces of sliced cheese. The kite indicated the witness was a rat and a liar, and threatened the witness and his family. The kite referenced a violent kidnapping and murder that had occurred in Albuquerque, and the author of the kite claimed to have photos of the witness's ex-wife. The author of the kite referenced taking the witness's ex-wife and making her their wife, and included a pornographic image to accompany the threat.

74.     Example 15: On July 21, 2018, SNM members JEROMY VASQUEZ, AKA: "JOKER," and JOHN SALAZAR, AKA: "STONER," went to the residence of federal probationer ALBERT HERRERA, who was on supervision for drug distribution and possession of a firearm in

furtherance of a drug trafficking crime. JEROMY VASQUEZ' vehicle had been torched earlier that day and JEROMY VASQUEZ confronted ALBERT HERRERA about the incident. JEROMY VASQUEZ was armed with a loaded pistol and confronted ALBERT HERRERA. ALBERT HERRERA produced an AK-47 rifle and the two men engaged in a shoot-out in front of ALBERT HERRERA's house. JEROMY VASQUEZ was killed in the shoot-out and ALBERT HERRERA fled the scene.

75.    Example 16: In August 2018, an SNM member who had been charged with murder in aid of racketeering, agreed to cooperate with the government and submitted to a debrief. Prior to this, the SNM member had been incarcerated with the other SNM RICO defendants. The SNM member related to the government that SNM leader ARTURO GARCIA, aka: "SHOTGUN," "wants to kill Acee (Special Agent Bryan Acee) or anyone on the prosecution team to make sure he remained good when he entered the feds (BOP)." ARTURO GARCIA boasted to the other inmates he had money and resources on the street to "get things done."

76.    Example 17: On or about January 11, 2019, SNM member DOMINIC SEDILLO, aka: "SICARIO," and an SNM associate shot a former member of the SNM, who had dropped-out of the gang. The shooting took place outside a residence in Albuquerque, New Mexico, and the victim survived, but did not cooperate with police. DOMINIC SEDILLO and the other suspect are currently facing aggravated battery charges as a result of that incident.

**U.S. v. ROBERT PADILLA, et al., 1449**

77.     Example 18:  On February 12, 2019, SNM member CHRISTOPHER CHAVEZ, aka: "CRITTER," was assaulted by SNM members DANIEL SANCHEZ, aka: "DAN DAN," ARTURO GARCIA, aka: "SHOTGUN," and CARLOS HERRERA, aka: "LAZY," at the Otero County Detention Center in Chaparral, New Mexico. I believe the assault was the result of CHRISTOPHER CHAVEZ having submitted a letter to U.S. District Court Judge James O. Browning stating he wanted to renounce the SNM and would sit down and debrief with the FBI. The letter was uploaded by the court into the online court file and visible to all of the other SNM racketeering defendants, via their attorneys.

78.     Example 19: On July 22, 2019, at about 11:30 p.m., former SNM leader LEROY LUCERO, aka: "SMURF," was shot and killed in the driveway of his residence in Las Vegas, New Mexico. LEROY LUCERO had testified in pretrial motions hearings and as a government witness during one of the government's lengthy RICO trials. I was present, as the case agent, during the trial and believe LEROY LUCERO's testimony was a significant factor in the conviction of several SNM members. Two eye witnesses identified SNM associates GARY COCA and ROBERT PADILLA as the persons who shot LEROY LUCERO. GARY COCA is currently in federal custody on drug distribution and armed robbery charges. ROBERT PADILLA is currently in federal custody on drug distribution charges. The homicide of LEROY LUCERO remains an active investigation.

79.     <u>Example 19:</u> In August 2019, SNM member MARVIN MCALLISTER, aka: "LOONEY," threatened a former SNM member, who testified for the government, and told the former member he (MARVIN MCALLISTER) obtained information "on all the cooperators" from SNM member ARTURO GARCIA, aka: "SHOTGUN." MARVIN MCALLISTER said, "you guys will have a welcoming party when you get there (BOP). Trust me, you guys got it coming." MARVIN MCALLISTER said he had reviewed ARTURO GARCIA's tablet device, which contained all of the discovery material in the RICO cases. MARVIN MCALLISTER told the witness the SNM had written the names of all the cooperators and sent the lists to SNM members in the state and federal prisons. MARVIN MCALLISTER also said the SNM had copies of newspaper clippings, which publicly identified cooperators utilized during the various RICO prosecutions.

80.     <u>Example 20:</u> In May 2020, two inmates at the Otero County Detention Center in southern New Mexico reported SNM member CARLOS HERRERA, aka: "Lazy," tasked SNM member VINCENT GARDUNO to contact the FBI cases agents upon his (GARDUNO's) release and volunteer to serve as an informant. Once accepted as an FBI informant, VINCENT GARDUNO was to "get close to Acee and kill him." CARLOS HERRERA and VINCENT GARDUNO were subsequently interviewed, with their counsel, by the FBI and both SNM members denied the allegation.

**U.S. v. ROBERT PADILLA, et al., 1451**

81.     Example 21:  On or about November 2, 2020, a former FBI CHS, who had cooperated with the government and testified in federal court proceedings, was shot several times in Colorado. The former CHS survived the shooting.

82.     Example 22: On November 25, 2020, a cooperating defendant at the Cibola County Correctional Center in Milan, New Mexico, was assaulted and stabbed by several other inmates after it was discovered the cooperating defendant was assisting the FBI in the murder investigation of government witness LEROY LUCERO, aka: "SMURF."   The assault on the cooperating defendant was initiated by SNM associate ROBERT PADILLA, aka: "FAT HEAD," who is the primary suspect in the murder of LEROY LUCERO, aka: "SMURF."

83.     Example 23: In late November 2020, a cooperating defendant within the Cibola County Correctional Center in Milan, New Mexico, overheard SNM members JONATHON GOMEZ, aka: "BABY G," SERGIO RODRIGUEZ, aka: "CHURO," TONEY GAUNA, aka: "WHISKERS," ROBERT TRUJILLO, aka: "SLEEPY," JODY RUFINO MARTINEZ, aka: "MONO," ANGEL DELEON, and SNM associate ROBERT PADILLA, aka: "FAT HEAD," discussing the government's case against the SNM. All of the aforementioned SNM members (other than ROBERT TRUJILLO) were charged with RICO violations. JODY RUFINO MARTINEZ and ANGEL DELEON are awaiting trial on VICAR murder charges. SNM associate ROBERT PADILLA is in custody on federal drug charges. The SNM members and ROBERT PADILLA discussed putting a green light on "Acee, Armijo,

**U.S. v. ROBERT PADILLA, et al.,  1452**

and Browning,"[7] and "lighting up the courtroom" when the case(s) went to trial.

## SNM MEMBERS MAINTAIN A STEADY SUPPLY OF WEAPONS

84.      I am aware members of the SNM use, possess, and conceal firearms and weapons. I have learned SNM members seek to be armed with weapons at all times, to include while incarcerated. Firearms are the preferred weapon while on the street. Bladed or blunt weapons, such as knives, shanks, razor blades and metal fittings are the weapons often possessed and used in prison or jail settings. I am aware NMCD officials and Deputy U.S. Marshals recovered shanks from SNM members, to include within the U.S. District Courthouse, during the earlier trial phase of this investigation.

85.      On June 5, 2019, NMCD officers discovered SNM member DANIEL SANCHEZ, aka: "DAN DAN," to have two metal shanks in his rectum. DANIEL SANCHEZ was placed in a "dry cell" (no toilet) until the shanks passed from his bowels and were recovered by officers. Prior to his arrival at the NMCD in June 2019, DANIEL SANCHEZ had been in USMS custody since December 2015, when he was charged with VICAR and RICO violations. DANIEL SANCHEZ may have

---

[7] FBI Special Agent Bryan Acee, Assistant U.S. Attorney Maria Armijo, and U.S. District Court Judge James Browning.

possessed those weapons on/in his person during his, and other defendants, eight week jury trial in Las Cruces, New Mexico.

86.     In February 2021, SNM member JODY RUFINO MARTINEZ, aka: "MONO," who has been charged with VICAR murder, RICO conspiracy, and firearm charges, was found to be in possession of a razor blade while attending a pretrial hearing at the federal courthouse in Albuquerque.

87.     To date, FBI agents have seized more than 70 firearms from SNM members and associates during Operations Atonement and Atonement II. Some of the firearms seized were purchased from SNM members during undercover buys. During one such incident, SNM member MATTHEW MARTINEZ, aka: "GOAT," sold an FBI informant four unused ballistic vests. MATTHEW MARTINEZ was found to be in possession of two firearms when FBI agents subsequently executed a search warrant on his residence.

88.     Over the course of the government's investigation, several additional SNM members were charged with being a felon in possession of a firearm or using a firearm in a crime of violence or drug trafficking offense.

89.     While investigating the SNM, I became aware that on at least three occasions, different SNM members solicited other members for firearms. In each of those instances, the SNM members seeking the firearms were multi-convicted felons and articulated a need to obtain a firearm to retaliate against someone or to "hit"

an informant. FBI agents were able to utilize undercover FBI agents or CHS to provide the firearms during reverse-undercover operations.[8]

90.     In summation, I believe firearms and weapons are critical "tools of the trade" for the SNM and members of DTOs. I believe SNM members possess weapons to commit murders; assaults; robberies; to avoid arrest; escape from custody; intimidate rivals, victims, and witnesses; to impose discipline within the gang; protect drug supplies; and for other criminal activity.

### THE CONFIDENTIAL HUMAN SOURCES

91.     During the course of this investigation, FBI case agents utilized several CHS and undercover agents to infiltrate and dismantle the SNM. Agents encouraged the various CHS to maintain contact with SNM members and associates who were engaged in ongoing criminal activity. Four CHS were utilized to collect information in the instant investigation. By doing so, the CHS have exposed themselves to a violent death by the SNM, should their identities become known. This affidavit seeks to provide the Court

---

[8] During all three instances, your affiant obtained anticipatory search warrants prior to the sale of the firearm(s) to the intended subjects. Once the firearm(s) were delivered to the target SNM member, an FBI SWAT team surrounded the location and arrested the purchaser of the firearm. FBI agents never "lost" a firearm, and each time a reverse-undercover operation was employed; the offender was successfully arrested for a violation of 18 U.S.C § 922(g)(1).

with some of the underlying circumstances and background information I relied upon in determining the information from the various CHS was reliable.

92.        In the paragraphs that follow, I have provided an overview of each CHS, to include:

a) their basis of knowledge concerning the criminal conduct;

b) motivation to assist the FBI;

c) criminal history;

d) any compensation received from the government; and

e) a statement concerning their reliability.

I tried to provide sufficient information to the Court, while balancing the anonymity and safety of the CHS.

93.        CHS 

U.S. v. ROBERT PADILLA, et al.,  1456



94.    CHS:

⁹ Financial assistance includes general payments, moving expenses, and fuel for the CHS's vehicle during operation support to the FBI.

Government Exhibit 1 (part 2)



95. ___ CHS-

**U.S. v. ROBERT PADILLA, et al., 1458**



96. **CBS**

U.S. v. ROBERT PADILLA, et al., 1459



97.     As described in detail below, the facts set forth in this affidavit provide probable cause to believe that the Target Subjects are involved in a conspiracy to intimidate and retaliate against victims, witnesses, and informants, and also in racketeering activities, to include a conspiracy to distribute controlled substances.

## STATEMENT OF PROBABLE CAUSE

98.     This affidavit is being submitted for four search warrants to aid the FBI in collecting evidence related to threats directed at government witnesses. In addition, I believe the Target Subjects to be armed with firearms and involved in a conspiracy to distribute controlled substances.

99.     The timing of the threat investigation is paramount, as SNM member JODY RUFINO MARTINEZ, aka: "MONO," is set to begin a lengthy jury trial on March 1, 2021, at the federal courthouse in Albuquerque. JODY RUFINO MARTINEZ has been charged with VICAR homicide, RICO conspiracy, and other related charges.

100.    The government is expected to call dozens of witnesses, many of whom are former SNM members and leaders. Some of the witnesses are out-of-custody and will be travelling to and from the federal courthouse. The FBI and USMS are working closely to mitigate any threats and preserve the safety of witnesses, prosecutors, and court staff, while not interfering with JODY RUFINO MARTINEZ' legal process.

101.    Based on CHS reporting, as well as my knowledge and experience concerning the modus operandi of the SNM, I believe **DENNIS CHARLES ARAGON, aka: "OSO;" VICTORIA JUANITA POHL-LUJAN; JOSE SANTIAGO RAMIREZ, aka: "TAZ;" LANCE ROMAN NATSEWAY, aka: "PEE-WEE;" DOMINIC ANTHONY GUTIERREZ, aka: "GAGE," SHAWN HENRY URAL, aka: "SHAWN SHAWN;" ROBERT HAROLD DEHERRERA, aka: "WESOS;" HERMAN MICHAEL ORTIZ, aka: "BABY FACE;"** and others, are conspiring to locate and murder a former SNM leader turned government witness. The Target Subjects have communicated their intent to monitor the public parking lots and pedestrian foot traffic around the federal courthouse in hopes of locating the former gang leader. The Target Subjects, and other unknown conspirators, intend to follow the former leader away from the courthouse and murder him.

102.    The Target Subjects are also suspected of participating in an on-going conspiracy to distribute controlled substances in furtherance of the SNM's objectives and purposes. I believe the drug distribution scheme is dependent on the strength,

**U.S. v. ROBERT PADILLA, et al., 1461**

influence and reputation of the SNM and the street gangs that support the SNM.

103.     I have described the murder plot and drug distribution schemes in the paragraphs that follow. I have also sought to identify the Target Subjects in greater detail, note whether they are state or federal SNM members or associates, or members of street gangs that support the SNM. I have also included the arrest history of the Target Subjects, and where possible, noted the felony offenses for which they were convicted.[10] I believe all of the Target Subjects of this investigation to be habitual offenders with impressive criminal histories, and extensive experience in the criminal justice system.

### The Target Subjects

104.     **DENNIS CHARLES ARAGON, aka: "OSO;"** is member of the SNM and San Jose street gang. DENNIS CHARLES ARAGON has at least 24 prior arrests in New Mexico with felony convictions for being a felon in possession of a firearm, possession of a controlled

---

[10] Criminal history records were obtained from the FBI's National Criminal Information Center (NCIC). I believe the records accurately reflect the subject's arrest record; however, conviction data is often not listed, or listed as "disposition unknown," because not all arresting agencies enter post-arrest data. In order to compile conviction data, I also consulted NM Courts online and the U.S. District Court Public Access to Court Electronic Records (PACER). Where possible, I have listed the subject's arrests and convictions.

substance, escape from jail, receiving stolen property, and unlawful taking of a motor vehicle.

105.     **VICTORIA JUANITA POHL-LUJAN** is an SNM associate and niece of DENNIS CHARLES ARAGON, aka: "OSO." VICTORIA JUANITA POHL-LUJAN has at least 15 prior arrests in New Mexico with four prior felony convictions for trafficking a controlled substance. VICTORIA JUANITA POHL-LUJAN has also been convicted of bringing contraband into jail and possession of a controlled substance. VICTORIA JUANITA POHL-LUJAN is currently on state probation in two matters: trafficking a controlled substance (D-202-CR-201502774) and possession of a controlled substance (D-809-CR-201900168).

106.     **JOSE SANTIAGO RAMIREZ, aka: "TAZ,"** is an SNM associate and member of the San Jose street gang. JOSE SANTIAGO RAMIREZ has three prior arrests in New Mexico and a prior federal conviction for conspiracy to distribute a controlled substance and money laundering.

107.     **LANCE ROMAN NATSEWAY, aka: "PEE-WEE,"** is an SNM member. LANCE ROMAN NATSEWAY has at least 29 prior arrests in New Mexico with felony convictions for robbery, aggravated battery with a deadly weapon, possession of a controlled substance, burglary, and criminal trespass. LANCE ROMAN NATSEWAY is currently being sought on an FBI arrest warrant for being a felon in possession of a firearm.

108.    **DOMINIC ANTHONY GUTIERREZ, aka: "GAGE,"** is a validated member of the SNM and is currently wanted by the USMS for violating the terms of his federal supervised release. DOMINIC ANTHONY GUTIERREZ has at least twenty-seven prior arrests in New Mexico and has been convicted of robbery, aggravated fleeing a law enforcement officer (x2), burglary (x2), forgery, auto theft, conspiracy to commit aggravated battery with a deadly weapon, criminal sexual contact and two prior federal cases for being a felon in possession of a firearm.

109.    DOMINIC ANTHONY GUTIERREZ appears to have two prior federal cases within the District of New Mexico, he was charged with Escape in Case No. 19-CR-01828-JB, and was sentenced to 15 months custody, followed by 3 years supervised release, to run concurrent to his term of supervised release in Case No. 13-CR-03294.

110.    I believe DOMINIC ANTHONY GUTIERREZ is a "career offender" within the meaning set forth in the U.S. Sentencing Guidelines (USSG) (§4B1.1.)[11] and may be subject to prosecution

---

[11] A defendant is a Career Offender if (1) he or she has been convicted in federal court of a felony crime of violence or drug-trafficking offense committed as an adult, and (2) has at least two prior felony convictions for either a crime of violence or drug trafficking offense or both that receive criminal history points under the guidelines. A Career Offender's guidelines sentence ordinarily is required to be at or near the statutory maximum for his or her federal conviction. Source: https://www.ussc.gov/education/glossary

**U.S. v. ROBERT PADILLA, et al., 1464**

under the Armed Career Criminal Act (ACCA)[12] if he is determined to be in possession of a firearm.

### Other Threat Actors Involved in the Conspiracy to Murder the Former SNM Gang Leader

111.    **FRANKIE GALLEGOS, aka: "FRANKIE G," aka: "CUNTE,"** is a validated member of the SNM and is believed to be the one of the highest ranking members of the SNM within the BOP. FRANKIE GALLEGOS is currently incarcerated at the USP in Beaumont, Texas, on a 2007 conviction for drug trafficking. Prior to becoming an SNM member, FRANKIE GALLEGOS was a member of the ESL street gang.[13]

---

[12] A statutory sentencing enhancement (See 18 U.S.C. § 924(e) and USSG §4B1.4) for a defendant convicted under 18 U.S.C. § 922(g) (prohibited person in possession of a firearm) who has at least three prior convictions for a "violent felony" or "serious drug offense" or both committed on occasions different from one another. A defendant sentenced as an Armed Career Criminal faces a mandatory minimum prison term of 180 months. Source: https://www.ussc.gov/education/glossary

[13] The ESL gang was the target of federal and state prosecution in 2007 for methamphetamine trafficking and multiple homicides. BEN GALLEGOS, the brother of FRANKIE, ANDREW and JOE GALLEGOS was subsequently convicted of operating a Continuing Criminal Enterprise.  Seven other members of the gang, to include FRANKIE GALLEGOS and ANDREW GALLEGOS were convicted of drug trafficking crimes.

**Albuquerque Journal: Task Force Investigates Valencia Gang Members, Friday, May 20, 2005, By Mike Gallagher, Journal Investigative Reporter.** Authorities are investigating members of an alleged Valencia County drug gang for possible involvement in the shooting and strangulation deaths of seven people. Over the last several months, the Journal has learned, a task force including federal, state and county officers has focused on alleged members of the East Side Locos. The gang is based in the Valencia County community of Los Chavez near Belen. A number of alleged gang members and associates have been arrested on drug charges and

are in federal custody. Also, there are indications that federal
prosecutors are considering the possibility of a death penalty
prosecution against some members of the gang. Federal, state and
local law enforcement agents arrested 10 of 12 suspects on federal
drug charges in early morning raids conducted in Valencia County
on March 10. The remaining two suspects have since been arrested.
After the drug arrests, law enforcement agencies established a
Combined Agency Homicide Team to investigate seven homicides in
Bernalillo and Valencia counties. The task force, announced at a
March 26 press conference, is composed of sheriff's deputies from
Valencia and Bernalillo counties, State Police and the DEA.
The victims: Investigators believe the killings were drug- or gang-
related, and some of the killings are described as exceptionally
cold-blooded. Cases under investigation include:

- The Nov. 26, 2004, strangulation deaths of Cruse Rael, 31,
  his girlfriend, Deanna Sais, 43, and her son Jason Slade, 22,
  at a house on Isleta SW.
- The April 18, 2004, shooting deaths of Eddie Verdugo and
  girlfriend Joyleen Chavez, 43, in their Los Chavez home.
- The Dec. 12, 2004, shooting death of Elizabeth Gonzales, 26,
  of Belen, whose body was found in a field east of Tome Hill.
- The December 2000 death of Phillip Silva, whose body was found
  on a South Valley ditch bank by a passer-by. Silva had a rope
  wrapped around his neck and a bag covering his head.

Arrest warrants in the drug case say the group moved and sold
methamphetamine, crack cocaine and marijuana between Valencia
County and California. Warrants also state that undercover
officers were able to buy methamphetamine from some gang members
for several months before the raid. The government also seeks the
forfeiture of $63,900 seized in the raid. Facing federal
indictment for conspiracy to distribute methamphetamine are:
Anthony "Bubba" Gallegos, 35; Ben "Benji" Gallegos, 33; Andrew
"Smiley" Gallegos, 29; Frankie "Cunte" Gallegos, 25; Raul "Silent"
Duran, 24; Robert "Moonman" Cloven, 48; Louis "Monster" Sisneros,
21; Juan "Juan-2-3" Calles, 30; Phillip "Spider" Chavira, 36;
Virgil Richardson, 34; Yvonne Buentiempo, 29; and Monica
Valenzuela, 28. Law enforcement officials consider the Gallegos
brothers the leaders of the group. State court records show Andrew
Gallegos also faces a charge that he attempted to smuggle drugs
into a corrections facility. Frankie Gallegos is on parole from a
series of indictments and guilty pleas dating back to 1997. Calles
is on parole from his 2000 guilty plea to leaving the scene of an
accident that killed veteran Albuquerque firefighter Chris J.
Chavez on Rio Bravo SW in June 1999. He was sentenced to seven and
a half years in prison. http://abqjournal.com/cgi-
bin/print it.pl?page=/news/state/352905nm05-20-05.htm

FRANKIE GALLEGOS is the brother of JOE LAWRENCE GALLEGOS and ANDREW GALLEGOS,[14] both of whom are also SNM and ESL members. FRANKIE GALLEGOS is considered a federal and state SNM member, due to his history of incarceration.

112.    I anticipate BOP officials may search FRANKIE GALLEGOS' prison cell on or about the time the requested search warrants are issued. If such a search is conducted, it will be in conformance with BOP policies and procedures, and not authorized by the issuance of the requested search warrants herein.

113.    **SAMUEL SILVA, aka "RABBS,"** is a validated member of the SNM, as well as the ESL, and is currently incarcerated at the USP Lee in Pennington Gap, Virginia. SAMUEL SILVA is one of the highest ranking SNM members in the BOP and his incarceration was the result of his District of New Mexico conviction on two counts of carjacking and using a firearm in the commission of a violent crime.

114.    In September 2018, while incarcerated at the USP Lee, SAMUEL SILVA murdered his cellmate. I believe the "hit" had been sanctioned by the Mexican Mafia prison gang and resulted in a favorable image for SAMUEL SILVA and the SNM. SAMUEL SILVA was

---

[14] During Operation Atonement, JOE LAWRENCE GALLEGOS was sentenced to two life sentences in federal prison upon his convictions in two VICAR murders. Defendant ANDREW GALLEGOS was sentenced to life in federal prison after being convicted of VICAR murder.

charged with a federal homicide as a result of the 2018 incident and is facing a death sentence if convicted in that matter.

115.     Because SAMUEL SILVA is currently facing federal murder charges and is represented by counsel in that matter, I have not communicated with, or requested, the BOP search or otherwise interfere with SAMUEL SILVA or his effects within the prison.

116.     **SHAWN HENRY URAL, aka: "SHAWN SHAWN,"** is a validated member of the SNM and previous target of the investigation. In years past, FBI case agents received information indicating SHAWN HENRY URAL participated in SNM meetings and discussed retaliating against anyone one cooperated with the FBI. Based on information from various CHS and records from the BOP, I believe SHAWN HENRY URAL is in communication with FRANKIE GALLEGOS. SHAWN HENRY URAL is currently out-of-custody and his whereabouts are unknown.

117.     **ROBERT HAROLD DEHERRERA, aka: "Wesos,"** is a validated member of the SNM and previous target of the overall SNM investigation. In years past, FBI case agents received information indicating ROBERT HAROLD DEHERRERA participated in SNM meetings and discussed retaliating against anyone one cooperated with the FBI. ROBERT HAROLD DEHERRERA is currently out-of-custody and being sought on a Bernalillo County bench warrant for domestic violence assault, issued 02/15/2021, Case No. T-4-DV-2020-004470. I

anticipate BCSO deputies may attempt to arrest ROBERT HAROLD DEHERRERA at his last know residence on or about the time the requested search warrants are executed. If such an arrest is conducted, it will be in conformance with BCSO policies and procedures, and not authorized by the issuance of the requested search warrants herein.

118.    **HERMAN MICHAEL ORTIZ, aka: "Baby Face,"** is a validated member of the SNM. HERMAN MICHAEL ORTIZ is not a prior target of the investigation and his whereabouts are unknown.

### The Conspiracy to Murder Government Witnesses

119.    In February 2021, CHS█, CHS█, CHS█, and CHS█ all reported the SNM maintained a greenlight list containing the names of persons the gang wished to kill. The greenlight list contained the names of informants and witnesses against the gang, as well as the FBI agents and AUSAs who had investigated the gang. All four CHS indicated former SNM gang leader G.A. was at the top of the list given G.A.'s historical influence within the gang and the fact that he became an FBI informant. By way of background, G.A. was charged with a VICAR conspiracy and then decided to cooperate with the government. G.A. testified as a government witness in several SNM jury trials. G.A. is out of custody and no longer resides in the area.

**U.S. v. ROBERT PADILLA, et al., 1469**

120.     The SNM conspiracy to murder G.A. is not new. In 2016, federal SNM leader FRANKIE GALLEGOS, aka: "FRANKIE G," aka: "CUNTE," called for the murder of G.A. and other SNM turncoats. FRANKIE GALLEGOS and SAMUEL SILVA, aka: "RABBS," although confined in separate U.S. Penitentiaries, are responsible for all SNM members within the BOP.  I believe both federal SNM leaders have closely monitored the progress of the SNM investigation, as the gang's presence within the BOP continues to increase dramatically. Such an increase is beneficial to the SNM within the federal system, as they have to interface with rival prison gangs and allies.  FRANKIE GALLEGOS has been inquiring about the progress of the case, to include who the suspected informants and cooperators are.  FRANKIE GALLEGOS has shown added interest in the case, as his brothers JOE LAWRENCE GALLEGOS and ANDREW GALLEGOS were prosecuted by the government on VICAR murder charges.  As the leaders of the federal SNM, FRANKIE GALLEGOS and SAMUEL SILVA are responsible for vetting the incoming SNM members to ensure none of them cooperated with the government, as any persons shown to have cooperated will have to be killed.  I believe additional scrutiny on incoming SNM members is warranted by the fact that a potential power struggle may ensue within the SNM, as several of the state SNM leaders that were prosecuted by the government may attempt to seize power from FRANKIE GALLEGOS and/or SAMUEL SILVA.

**U.S. v. ROBERT PADILLA, et al., 1470**

121.    Within the past month, CHS-█, CHS█ and CHS█ met with the Target Subjects and other SNM members and associates on multiple occasions and under varying conditions. CHS-█ CHS█ and CHS-█ reported the Target Subjects discussed the fact that SNM leader FRANKIE GALLEGOS had renewed the hit on former SNM leader G.A. and thought the carnals should try to take G.A. out when he travelled away from the federal courthouse in Albuquerque where they expect him to testify.

122.    CHS-█ and CHS█ knew through official SNM communication channels that SAMUEL SILVA placed a greenlight on SNM member FRED QUINTANA because SAMUEL SILVA believed FRED QUINTANA to be an informant. By way of background, SAMUEL SILVA was charged in 2014 within the District of New Mexico with two counts of carjacking, using a firearm in a crime of violence, and being a felon in possession of a firearm. SAMUEL SILVA remained in federal custody, pending two jury trials.[15] While incarcerated at the Santa Fe Detention Center, SAMUEL SILVA communicated with FRANKIE GALLEGOS, who was incarcerated within the BOP, through a known intermediary. SAMUEL SILVA and FRANKIE GALLEGOS discussed SAMUEL SILVA's pending federal case and the overall racketeering case against the SNM. SAMUEL SILVA and FRANKIE GALLEGOS are both

---

[15]    On July 11, 2016, Silva was found guilty of being a felon in possession of a firearm. On August 16, 2016, Silva was found guilty of carjacking and using a firearm during a crime of violence.

from the ESL street gang in Valencia County and are longtime
associates. SAMUEL SILVA indicated he was looking for some help
to have the victims in his carjacking case not testify. CHS-█ was
subsequently introduced to SAMUEL SILVA, after FRANKIE GALLEGOS
verified CHS-█ was "a good soldier" and a member of the SNM's
federal roster.

123.    SAMUEL SILVA asked CHS-█ to locate and murder the
two victims in his pending carjacking case. SAMUEL SILVA also
mentioned that he wanted FRED QUINTANA, aka: "Flaco," aka: "Joe-
Joe," killed because he was a rat. SAMUEL SILVA was also upset
because one of the carjacking victims was a relative of FRED
QUINTANA's and FRED QUINTANA would not persuade the person to drop
the charges against SAMUEL SILVA. In fact, when SAMUEL SILVA asked
FRED QUINTANA to convince his relative to not testify, FRED
QUINTANA became upset and told SAMUEL SILVA that he would kill him
(SILVA) as soon as he had the opportunity. At the time, the two
men were in custody together, within the SNM pod, at the Bernalillo
County Metropolitan Detention Center, in Albuquerque.

124.    SAMUEL SILVA told CHS-█ that he had previously
asked SNM member VINCENT GARDUNO, aka: "FATAL," to hit the victims
and VINCENT GARDUNO agreed; however, the FBI arrested VINCENT
GARDUNO on RICO charges before he could do the job.

125.    In recent weeks, CHS-█ reported that in late
November 2020, SNM associate ROBERT PADILLA, aka: "FAT HEAD,"

directed four inmates within the Cibola County Correctional Center in Milan, New Mexico, to assault inmate P.G. In the days prior to the assault, ROBERT PADILLA admitted to inmate P.G. that ROBERT PADILLA had killed former SNM leader LEROY LUCERO, aka: "SMURF." ROBERT PADILLA also provided inmate P.G. with significant details pertaining to his drug trafficking activities. Inmate P.G. agreed to wear a covert FBI recording device while speaking with ROBERT PADILLA.[16] Meanwhile, inmate P.G.'s cellmate noticed P.G. sending tablet messages to an institutional gang investigator and told ROBERT PADILLA. ROBERT PADILLA then directed four inmates to stab and assault P.G. Shortly thereafter four inmates entered P.G.'s cell and kicked, punched and stabbed P.G. After the assault, the inmates exited P.G.'s cell and P.G. stumbled toward the pod exit door. ROBERT PADILLA approached P.G. and punched him in the upper torso. The aforementioned assault was captured on jail surveillance video.

126. P.G. received medical treatment and was subsequently sent to the secure housing unit (SHU). While in the SHU, P.G. received three kites (letters) from ROBERT PADILLA. In the first kite, ROBERT PADILLA said he was aware that P.G. was talking to law enforcement and told P.G. he would give him $25,000

---

[16] On November 25, 2020, FBI agents delivered a covert recording device to the Cibola County Correctional Center; however, correctional officers were unable to get the device to P.G. before the assault took place.

to recant his story. The second kite contained a threat in which ROBERT PADILLA told P.G. he would kill him. The third kite contained an offer of $35,000 if P.G. would recant and tell the FBI he (P.G.) had lied about ROBERT PADILLA confessing to the murder of LEROY LUCERO.

127.    In late November 2020 and/or early December 2020, CHS■ was incarcerated at the Cibola County Correctional Center with SNM members JODY RUFINO MARTINEZ, aka: "MONO," JONATHAN GOMEZ, aka: "BABY G," TONY GAUNA, aka: "WHISKERS," VINCENT GARDUNO, aka: "FATAL," ANGEL DELEON, ROBERT TRUJILLO, aka: "SLEEPY," and SNM associate ROBERT PADILLA, aka: "FAT HEAD." CHS■ reported the aforementioned SNM members and associate discussing the fact that a greenlight had been put on Bryan Acee, a federal judge, and an AUSA. The men also discussed "lighting up the courtroom" when they were on trial. The men also discussed the fact that VINCENT GARDUNO, aka: "FATAL," had failed his previous assignment to hit Agent Acee and the task had been reassigned to ROBERT TRUJILLO. The men discussed the hit on the AUSA had been sanctioned by SNM member CARLOS HERRERA, aka: "LAZY" (during Operation Atonement, CARLOS HERRERA was convicted of VICAR murder and sentenced to life in federal prison).

128. Within the past 15 days, CHS■ met with LANCE ROMAN NATSEWAY, aka: "PEE-WEE" and LANCE ROMAN NATSEWAY offered to sell CHS-■ a 9mm pistol. CHS-■ declined the offer. CHS■ has known LANCE

ROMAN NATSEWAY for many years and said LANCE ROMAN NATSEWAY normally carried a pistol in his waistband. CHS█ and LANCE ROMAN NATSEWAY talked about the SNM case and LANCE ROMAN NATSEWAY mentioned the carnals had a plan to hit former SNM gang leader G.A. LANCE ROMAN NATSEWAY said some of the homies had previously asked LANCE ROMAN NATSEWAY to surrender on a state probation violation so he could get near G.A. and hit him. LANCE ROMAN NATSEWAY said he had been on the run and didn't get picked up on a probation violation in time. LANCE ROMAN NATSEWAY went on to say that JODY RUFINO MARTINEZ and ANGEL DELEON were going to trial in March (2021) and G.A. would be snitching in court. LANCE ROMAN NATSEWAY pointed to the 9mm in his waistband and said, "We'll get that bitch then." LANCE ROMAN NATSEWAY indicated the SNM could not fail to get G.A. because he (G.A.) had been the big homie and Angel (MUNOZ) had loved G.A.[17]

129.    Over the past 10 days, CHS█ and CHS█ have been at separate meetings with the various Target Subjects and SNM member SHAWN HENRY URAL, aka: "SHAWN SHAWN."[18] During those meetings,

---

[17] ANGEL MUNOZ was the founding member of the SNM and is considered the "Godfather" of the gang. LANCE ROMAN NATSEWAY's mother is ROSA MUNOZ, the former wife of ANGEL MUNOZ. While LANCE ROMAN NATSEWAY is not ANGEL MUNOZ' biological son, CHS█ said that LANCE ROMAN NATSEWAY and his siblings all claim to have been raised by ANGEL MUNOZ,

[18] The meetings were informal and held on different days, times, and locations. In most cases, the primary purpose of the meetings pertained to drug transactions among the SNM members/associates.

SHAWN HENRY URAL and the Target Subjects discussed the upcoming trial and the fact that the SNM was on a mission to kill G.A. CHS-██ and CHS██ independently reported that DOMINIC ANTHONY GUTIERREZ, aka: "GAGE," and SHAWN HENRY URAL had received word from FRANKIE GALLEGOS concerning G.A. SHAWN HENRY URAL related FRANKIE GALLEGOS and the carnals from the feds knew G.A. was on the government's witness list for the upcoming trial of JODY RUFINO MARTINEZ, aka: "MONO," and wanted the "carnals to put in skina and hit (G.A.)."

130.    SHAWN HENRY URAL and the Target Subjects discussed the fact that the trial started the first week of March, at the federal courthouse in Albuquerque, and that the out-of-custody witnesses would have to park near the City/Metro Courthouse and enter the federal courthouse via the main lobby. The Target Subjects believed G.A. had undergone plastic surgery to alter his appearance; however, they surmised they would recognize his eyes, tattoos, balding hairline, and general gait. The Target Subjects described some of G.A.'s nervous mannerisms that would make him easier to spot. SHAWN HENRY URAL and the Target Subjects discussed G.A. would likely arrive in a rental car with Texas or Florida plates and would be staying in a government funded hotel room or with his sister, or aunt, in Albuquerque. The Target Subjects decided the best course of action would be to follow G.A. away

---

Two meetings occurred during chance encounters and two additional meetings took place at the request of the CHS.

U.S. v. ROBERT PADILLA, et al., 1476

from the courthouse and identify what location he was staying at. Once the location was verified, SHAWN HENRY URAL told the Target Subjects to keep an eye on it until the other Target Subjects could arrive. CHS █ described DOMINIC ANTHONY GUTIERREZ and LANCE ROMAN NATSEWAY as being very enthusiastic about getting a chance to hit G.A.

131.     CHS █ reported that some of the Target Subjects believed G.A. could be lured to a party via a woman and given a hotshot, but FRANKIE GALLEGOS wanted G.A. killed via a shooting or stabbing. CHS █ related FRANKIE GALLEGOS wanted everyone to know what actually happened to G.A. (homicide vs. perceived overdose death).

132.     During the various meetings with the Target Subjects, DENNIS CHARLES ARAGON, JOSE SANTIAGO RAMIREZ, LANCE ROMAN NATSEWAY, and DOMINIC ANTHONY GUTIERREZ all indicated they had firearms, were willing to kill G.A., and would respond to whatever location G.A. was at.

133.     DOMINIC ANTHONY GUTIERREZ told the Target Subjects that fed SNM members GREGORY MONTOYA, aka: "JYNX," and JUAN MARTINEZ, aka: "BABY," were no good and to stay away from them. DOMINIC ANTHONY GUTIERREZ claimed both SNM members talked to FBI agents after they were arrested on firearms charges.

134.     Within the past 5 days, CHS █ was with JOSE SANTIAGO RAMIREZ (and other persons) and witnessed several SNM and San Jose

U.S. v. **ROBERT PADILLA, et al.,** 1477

gang members purchase heroin and fentanyl tablets from JOSE SANTIAGO RAMIREZ. CHS ▆ reported that JOSE SANTIAGO RAMIREZ sold heroin and fentanyl from his residence and delivered drugs to clients. During one such transaction, CHS ▆ observed JOSE SANTIAGO RAMIREZ provide DENNIS CHARLES ARAGON and VICTORIA JUANITA POHL-LUJAN with six ounces of heroin and several hundred small blue fentanyl tablets. During the transaction, JOSE SANTIAGO RAMIREZ and DENNIS CHARLES ARAGON talked about the pending SNM trial and whether or not anyone had seen G.A. around town. The two men surmised G.A. would be up to his old tricks and looking to score dope. Both men commented that it was only a matter of time before G.A. showed up. DENNIS CHARLES ARAGON indicated G.A. would not know VICTORIA JUANITA POHL-LUJAN, or would not recognize her, and she could get him to a party. VICTORIA JUANITA POHL-LUJAN said she was down and would keep him high and distracted until the others could get him (G.A.). JOSE SANTIAGO RAMIREZ and DENNIS CHARLES ARAGON talked about the SNM having mixed heroin and rat poison together in the Old Main (Santa Fe prison) to administer hot shots in the past. The men thought G.A. would expect such a tactic, as G.A. had served a lot of time at the Old Main. The men joked that G.A. would not see "the bullet that finds his head." CHS ▆ observed JOSE SANTIAGO RAMIREZ and DENNIS CHARLES ARAGON to be armed with pistols during the drug transaction.

U.S. v. ROBERT PADILLA, et al., 1478

135.     Within the past 3 days, CHS-█ spoke with SHAWN HENRY
URAL and learned SNM members ROBERT HAROLD DEHERRERA, aka: "WESO,"
and "BABY FACE"[19] had been tasked with finding G.A.   CHS-█
volunteered (at my direction) to help the other men with the
mission. SHAWN HENRY URAL declined CHS-█ offer, as SHAWN HENRY
URAL indicated G.A. would easily recognize CHS-█ CHS█ was unable
to ask further questions at that time.

## Drug Distribution in Furtherance
## of the SNM Criminal Enterprise

136.     The SNM has historically generated income by
distributing controlled substances, extorting weaker drug dealers,
and participating in robberies and burglaries. Although the SNM is
one organization, the gang operates in subgroups in different
geographic locations. For example, each NMCD facility has a
localized group of SNM members, with a leader, or panel of leaders.

---

[19] FBI, NMCD and MDC STG gang investigators queried law enforcement
and corrections databases and believe "BABY FACE" is most likely
SNM validated member HERMAN MICHAEL ORTIZ.  No other SNM members
were found to have used the moniker BABY FACE. That being said, I
am not certain HERMAN MICHAEL ORTIZ, aka: "BABY FACE," is in-fact
the person spoke of in the conspiracy. I am aware ROBERT HAROLD
DEHERRERA is of questionable status within the SNM and such members
are often referred to as "torpedoes," and utilized to conduct
"suicide missions." Similarly, I discovered HERMAN MICHAEL ORTIZ'
criminal history noted he had previously registered as a sex
offender.  If HERMAN MICHAEL ORTIZ had sex charges in his
background, he would be considered "no good" within the gang and
could be utilized as a torpedo. The SNM refer to such tactics as
"taking the trash out with the trash" (or using questionable
members to conduct high risk missions against rivals or
informants).

On the streets, the State of New Mexico is broken up into regions: north, south, east and west.

137.    Although there are different subgroups, the method of operation remains the same. Incarcerated members are expected to create opportunities to smuggle drugs and contraband cell phones into the facilities, and manufacture weapons. A portion of drugs and/or drug proceeds are shared with other SNM members. Drugs are sold to the larger inmate population within the prison(s), and fellow SNM members are expected to band together to ensure payment for drugs is collected. In some cases, where the SNM controlled a prison, or section of the prison, other inmates are taxed on their sales of narcotics. The same methods are utilized in SNM dominated neighborhoods in New Mexico, where smaller drug dealers are taxed by governing SNM members. SNM members on the street exercise more autonomy from gang leaders, but are expected to take care of SNM business and share drugs or proceeds with their incarcerated brothers. SNM members work together to manage non-SNM drug dealers on the street and within prison walls, to include: the demand for payment of tributes or taxes, the assurance of protection and support in exchange for payment, and the threat of or use of violence if payment was not made.

138.    I believe the operation of different SNM groups in different areas of the state, and in federal prisons, does not contradict the existence of a single conspiracy. I believe the

**U.S. v. ROBERT PADILLA, et al, 1480**

activities of the SNM members are coordinated, so as to ensure the group supports the plans and proclamations in the best interest of the whole group. For example, SNM leaders must coordinate to ensure no two groups were taxing the same drug dealer. I am aware SNM leaders manage the operations of their subordinates, to include:

    a) consistent methods for smuggling drugs into prison,

    b) an established system for the distribution and sale of drugs once inside a facility,

    c) which involved the standard tribute given to SNM members,

    d) the advertisement of drugs for sale,

    e) the method of payment, and

    f) the threat of violence for nonpayment.

139.    For each of the activities described herein, I believe there is probable cause to believe SNM members and associates knew of the activities of others within the group, and the drug distribution schemes were heavily dependent on the reputation and strength of the SNM as an entire organization. Moreover, each scheme was intended to benefit all members and associates within the enterprise.

140.    In the paragraphs that follow, I have provided details related to some of the more recent and ongoing drug distribution conspiracies that furthered the SNM enterprise.

## Methamphetamine and Fentanyl Distribution in Albuquerque

141.     In late December 2018, the FBI received information indicating federal probationer KARLA PENA was selling fentanyl and methamphetamine in southeast Albuquerque and serving as a drug source of supply to SNM members in Albuquerque. FBI case agents observed KARLA PENA visiting known SNM members, who had significant backgrounds in drug trafficking.

142.     Sometime later, an undercover agent (UCA) was able to establish a relationship with KARLA PENA and purchased fentanyl and methamphetamine from her. The UCA subsequently ordered bulk quantities of fentanyl and methamphetamine, at which time the UCA was introduced to KARLA PENA's sister, MARYSOL PENA, and associate GUILLERMO RODRIGUEZ. The UCA purchased 900 tablets of fentanyl and one pound of methamphetamine from the trio, in southeast Albuquerque.

143.     In late January 2019, KARLA PENA and GUILLERMO RODRIGUEZ delivered thirteen pounds of methamphetamine and 700 fentanyl tablets to the UCA in Albuquerque. KARLA PENA and GUILLERMO RODRIGUEZ were arrested at that time and case agents executed a federal search warrant on KARLA PENA's southeast Albuquerque apartment. Agents located an additional pound of methamphetamine and 100 fentanyl tablets.

144.     MARYSOL PENA remained a fugitive until August 2, 2019, when she was arrested by detectives in Provo, Utah, with approximately 3.5 pounds of heroin.[20]

145.     I do not believe KARLA PENA, MARYSOL PENA, or GUILLERMO RODRIGUEZ to be members of the SNM; rather they served as a methamphetamine and fentanyl source of supply for SNM members. I know the SNM participates in methamphetamine and heroin sales all over New Mexico, to include within prison and jail facilities.

146.     I reviewed KARLA PENA's post-arrest jail calls and noted that during several of her calls, she referenced a particular member of the SNM as being "no good" and believed the SNM member would be killed by the gang. In other calls, KARLA PENA related an SNM member was a rat and working for the FBI. KARLA PENA provided information to one of her sisters to get word to an SNM associate, so the associate was aware of the suspected informant.

### Heroin from Ciudad Juarez, Mexico

147.     In June 2019, I received information indicating SNM members HENRY FELIX, aka: "CHATO," DOMINIC SEDILLO, aka: "SICARIO," and others were involved in trafficking heroin to street-level dealers in Albuquerque and Española, New Mexico. Additional information indicated HENRY FELIX was armed and distributing heroin from his residence within the San Jose

---

[20] https://www.abqjournal.com/1348852/fugitive-in-local-fentanyl-case-caught-in-utah.html

**U.S. v. ROBERT PADILLA, et al., 1483**

neighborhood of Albuquerque. HENRY FELIX is also a member of the San Jose street gang.

148.     On July 22, 2019, FBI agents executed a federal search warrant on HENRY FELIX's residence in Albuquerque. During a search of the residence, agents seized several ounces of heroin, a stolen handgun, ammunition and drug packaging material. HENRY FELIX was arrested for possession of a firearm in furtherance of a drug trafficking crime, being a felon in possession of a firearm and possession of heroin with intent to distribute. Later that afternoon, DOMINIC SEDILLO was arrested at his residence in Albuquerque on an outstanding felony warrant for aggravated battery with a firearm.

### SNM Drug Trafficking in Las Vegas, New Mexico

149.     In July 2019, FBI case agents paired up with the DEA, NMSP, and the Las Vegas Police Department to investigate SNM operations in northern New Mexico, as well as the interconnected ROBERT PADILLA DTO. The investigation was predicated on the July 2019 murder of government witness LEROY LUCERO, aka: "SMURF." The investigation culminated with the execution of 27 federal search warrants and 24 federal arrest warrants in Albuquerque, Santa Fe, Española, Las Vegas and Wagon Mound, New Mexico. A total of 33 arrests were made and 57 firearms were seized. Substantial leads related to the LEROY LUCERO homicide were developed. ROBERT PADILLA and others were arrested with drug trafficking charges.

## SNM Drug Trafficking in Bernalillo County, New Mexico

150.     In September 2020, BCSO Community Action Team (CAT) detectives developed information indicating MICHAEL HERNANDEZ, AKA: "POLO," a member of the San Jose street gang and SNM, was selling multiple pounds of methamphetamine per week in Albuquerque. BCSO detectives contacted your affiant, based on the connection to the SNM gang. An investigation into MICHAEL HERNANDEZ was initiated and several cooperating defendants and CHS within the SNM and San Jose gangs provided information on his drug trafficking activities.

151.     Multiple CHS reported SNM and San Jose street gang members were assisting MICHAEL HERNANDEZ with the distribution of methamphetamine and heroin. In addition to being supplied by MICHAEL HERNANDEZ, SNM members served as "muscle" for MICHAEL HERNANDEZ and helped collect drug debts for MICHAEL HERNANDEZ.

152.     On December 1, 2020, FBI agents and BCSO detectives executed federal search warrants on two of MICHAEL HERNANDEZ' residences in Albuquerque and seized more than 30 pounds of methamphetamine, 2 pounds of heroin, approximately $10,000.00, a money counting machine, and two vehicles. MICHAEL HERNANDEZ was arrested and charged with federal drug trafficking violations.

## The February 2021 SNM Drug Trafficking Investigation

Note: *The following conversations and observations, as reported by the CHS, were conducted within the specified Target Subject's residence or vehicle. I have sought to keep the specific locations ambiguous, in order to protect the CHS.*

153.     Within the past 10 days, CHS█ spoke with LANCE ROMAN NATSEWAY and learned LANCE ROMAN NATSEWAY was selling heroin for DENNIS ARAGON. LANCE ROMAN NATSEWAY said he was "doing good" (making money) and using heroin, which he said was good quality.

154.     Through my conversations with NMCD officials, I am aware LANCE ROMAN NATSEWAY submitted a urinalysis sample to state probation officers on February 23, 2021. NMCD officials subsequently advised me that LANCE ROMAN NATSEWAY's urinalysis test returned positive for methamphetamine and opioids.[21]

155.     Within the past 10 days, CHS█ observed DENNIS CHARLES ARAGON, aka: "OSO," pick up several ounces of heroin from JOSE SANTIAGO RAMIREZ, aka: "TAZ."

---

[21] NMCD officials shared this information with me because they were aware FBI agents would be seeking to arrest LANCE ROMAN NATSEWAY on federal firearms charges and searching his residence pursuant to the requested search warrant.

**U.S. v. ROBERT PADILLA, et al, 1486**

156.    Within the past 5 days, CHS█ observed VICTORIA JUANITA POHL-LUJAN pick up several hundred blue fentanyl tablets from JOSE SANTIAGO RAMIREZ, aka: "TAZ."

157.    Within the past 3 days, CHS█ spoke with DOMINIC ANTHONY GUTIERREZ and inquired about fentanyl. DOMINIC ANTHONY GUTIERREZ indicated he could send his "girl" to deliver to CHS█ whenever CHS█ was ready. I believe DOMINIC ANTHONY GUTIERREZ was referring to his girlfriend KAYLEIGH SMITH; however, he may also have been referring to VICTORIA JUANITA POHL-LUJAN.

### THE SUBJECT PREMISES:

158.    I have reviewed law enforcement databases, driver's license information, vehicle registration records, conferred with SNMCD and USPO officers, and I believe the following Target Subjects are living at the specified locations (A-1 through A-5) listed below.

159.    **Subject Premises A-1:** I believe DENNIS CHARLES ARAGON, aka: "OSO," lives at Subject Premises A-1, located at █████ ██████ ████████ ██ ████████ ███ Albuquerque, New Mexico. Subject Premises A-1 may be described as two story apartment building with white siding and gray brick and pink wood trim. There is a storm door over the front door and the number █ is posted on the front door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A.

U.S. v. ROBERT PADILLA, et al., 1487

Indicia of Residence:

a) Case agents have observed DENNIS CHARLES ARAGON enter
and exit Subject Premises A-1 on dozens of occasions
over the duration of the investigation. The most recent
observations were made within the past 24-hours.

b) Subject Premises A-1 was DENNIS CHARLES ARAGON's
residence of record while he served a federal term of
supervised release, which terminated on or about
February 10, 2020, Case No. 12-CR-01395-JAP.

c) Multiple CHS have visited DENNIS CHARLES ARAGON at
Subject Premises A-1 in recent weeks.

d) Official police records list Subject Premises A-1 as
DENNIS CHARLES ARAGON's residence.

160.     **Subject Premises A-2:** I believe JOSE SANTIAGO
RAMIREZ, aka: "TAZ," lives at Subject Premises A-2, located at ▮
▮▮▮▮▮▮▮▮▮▮▮ Albuquerque, New Mexico. Subject Premises A-2
may be described as a single story residence with tan siding and
brown trim. There is a doghouse in the front yard with the letters
"SJ" painted in turquoise on it. The numbers ▮▮ are posted on the
mailbox and telephone pole in front of the house. A color
photograph of Subject Premises A-2 has been attached and
incorporated in Attachment A.

### Indicia of Residence:

a) Subject Premises A-2 is listed as JOSE SANTIAGO RAMIREZ' residence on his valid New Mexico driver's license, which was issued on December 31, 2019.

b) Case agents have observed JOSE SANTIAGO RAMIREZ enter and exit Subject Premises A-2 on several occasions within the past several months. The most recent observations were made within the past 48-hours.

c) Multiple CHS have visited JOSE SANTIAGO RAMIREZ at Subject Premises A-2 in recent weeks.

d) Official police records list Subject Premises A-2 as JOSE SANTIAGO RAMIREZ residence.

161.     **Subject Premises A-3:** I believe VICTORIA JUANITA POHL-LUJAN lives at Subject Premises A-3, located at ▮▮ ▮▮ ▮▮ ▮▮ Albuquerque, New Mexico. Subject Premises A-3 may be described as single story house with a flat roof, tan siding and brown trim. The numbers ▮▮ are posted on the mailbox in front of the residence. A color photograph of Subject Premises A-3 has been attached and incorporated in Attachment A.

### Indicia of Residence:

a) Subject Premises A-3 is listed as VICTORIA JUANITA POHL-LUJAN's residence on her valid New Mexico driver's license, which was issued on June 9, 2020.

b) VICTORIA JUANITA POHL-LUJAN is currently on state

U.S. v. ROBERT PADILLA, et al., 1489

probation in two matters and Subject Premises A-3 is her residence of record with the NMCD.

c) Case agents have observed VICTORIA JUANITA POHL-LUJAN enter and exit Subject Premises A-3 on several occasions within the past two weeks. The most recent observations were made within the past 24-hours.

d) Multiple CHS have visited VICTORIA JUANITA POHL-LUJAN at Subject Premises A-3 in recent weeks.

e) Official police records list Subject Premises A-3 as VICTORIA JUANITA POHL-LUJAN's residence.

162.    **Subject Premises A-4:** I believe LANCE ROMAN NATSEWAY, aka: "PEE-WEE," lives at Subject Premises A-4, located at ██ ██████ ████████ ██ ███████ █, Albuquerque, New Mexico. Subject Premises A-4 may be described as single story apartment complex with tan siding and white trim. The name Broadway Apartments and the number ██ is posted at the entrance to the complex. The front door to Subject Premises A-4 is green in color and the number ██ is posted on the center of the door. A color photograph of Subject Premises A-4 has been attached and incorporated in Attachment A.

### Indicia of Residence:

a) LANCE ROMAN NATSEWAY is currently on state probation and Subject Premises A-4 is his residence of record with the NMCD.

b) Case agents have observed LANCE ROMAN NATSEWAY enter and exit Subject Premises A-4 on several occasions within the past three months. The most recent observations were made within the past 72-hours.

c) At least two CHS have visited LANCE ROMAN NATSEWAY at Subject Premises A-4 in recent weeks.

d) Official police records list Subject Premises A-4 as LANCE ROMAN NATSEWAY's residence.

163.     **Subject Premises A-5:** DOMINIC ANTHONY GUTIERREZ, aka: "GAGE," is a USMS fugitive and has been since he violated the terms of his post-prison TSR in December 2020. I believe DOMINIC ANTHONY GUTIERREZ is currently living with his girlfriend, KAYLEIGN SMITH, at Subject Premises A-5, located at ████████████ ████ ██, Albuquerque, New Mexico. Subject Premises A-5 may be described as a single story residence. The siding, trim and front door are tan in color and the numbers ████ are posted on the front of the house. A color photograph of Subject Premises A-5 has been attached and incorporated in Attachment A.

### Indicia of Residence:

a) Bernalillo County property records indicate Subject Premises A-5 is currently owned by KAYLEIGH SMITH and JOSEPH SHAW, Parcel No. ██████████████.

b) On April 19, 2019, USPO learned DOMINIC ANTHONY GUTIERREZ was friends with KAYLEIGH SHAW (aka: KAYLEIGH

**U.S. v. ROBERT PADILLA, et al.,  1491**

SMITH).

c) BOP officials advised me DOMINIC ANTHONY GUTIERREZ sent and received correspondence through the mail with KAYLEIGH SMITH while DOMINIC ANTHONY GUTIERREZ was an inmate.

d) On May 10, 2019, USPO spoke with DOMINIC ANTHONY GUTIERREZ about his release plans, and he indicated he would like to reside with his girlfriend KAYLEIGH SMITH.

e) On May 13, 2019, USPOs were able to confirm the information provided by DOMINIC ANTHONY GUTIERREZ regarding his relationship with KATLEIGH SMITH and their plans to reside with one another upon DOMINIC ANTHONY GUTIERREZ' release from the the Diersen Charities Residential Reentry Center (RRC) in Albuquerque.

f) On June 3, 2019, DOMINIC ANTHONY GUTIERREZ absconded from Diersen RRC and was placed on Escape status. A warrant was issued for his arrest for violating his BOP Prerelease.

g) On July 20, 2019, KAYLEIGH SMITH posted a Facebook photograph to her Facebook page "Kayleigh Gutierrez" with DOMINIC ANTHONY GUTIERREZ. The photo depicted the two with their heads, smiling, and as if they are about to kiss.

h) On October 18, 2019, BCSO responded to a gas station

after receiving a call regarding a vehicle parked at a gas pump with a male and female passed out inside. The male was ultimately identified as DOMINIC ANTHONY GUTIERREZ and the female was identified as KAYLEIGH SMITH. They were woken up and the defendant was initially uncooperative. However, his demeanor changed upon it being explained to him he was not in trouble. While speaking with him though, a hypodermic needle was observed in his immediate vicinity, and he also admitted to being in possession of multiple knives. Due to DOMINIC ANTHONY GUTIERREZ providing false information, he was not initially identified and was permitted to leave the scene. He then walked by a short time later, and upon his true identity being discovered, he was taken into custody on his outstanding federal warrant and incarcerated.

i) On December 30, 2019, KAYLEIGH SMITH signed and submitted conditional release documentation in Sandoval County Court Case No. M-45-FR-2019-907 in which she listed her address as Subject Premises A-5.

j) On December 16, 2020, DOMINIC ANTHONY GUTIERREZ commenced his term of supervised release and was placed at Diersen RRC pursuant to his judgment.

k) On December 22, 2020, DOMINIC ANTHONY GUTIERREZ

communicated a desire to reside with his wife, Kayleigh Gutierrez (Kayleigh Smith) upon his release from Diersen RRC and indicated she would be contacting the USPO soon.

l) On December 26, 2020, DOMINIC ANTHONY GUTIERREZ absconded from the Diersen RRC and a warrant was issued for his arrest. He remains a fugitive.

m) On February 15, 2021, a citizen who had been the victim of an auto theft (hereinafter "Citizen-1") received a call from a friend indicating Citizen-1's stolen vehicle was parked in front of Subject Premises A-5. Citizen-1 and four of his friends responded to the area and established physical surveillance on Subject Premises A-5. Citizen-1 told me he called APD after confirming the presence of his stolen vehicle. While Citizen-1 and his friends monitored the location, they observed approximately six Hispanic male adults arrive at Subject Premises A-5. One male subsequently departed the location; however, at least five other males remained in the house. Citizen-1 described one of the men as being distinctly shorter than the other men. He also said the shorter man wore very baggie clothes and had a hoodie over his head, although Citizen-1 recalled it was not cold outside (DOMINIC ANTHONY GUTIERREZ is approximately 5-01 in height and about 160 pounds). APD officer

**U.S. v. ROBERT PADILLA, et al., 1494**

subsequently arrived on scene and made contact with KAYLEIGH SMITH and two other males; however, the police officers did not enter Subject Premises A-5. Citizen-1 said the short male with the hoodie over his head never emerged from the house, nor the two other men.

n) On February 25, 2021, KAYLEIGH SMITH was a passenger in a vehicle that engaged in a high speed pursuit with NMSP in Albuquerque. During the lengthy pursuit, the suspect vehicle briefly stopped, and an unknown male was able to flee into the night and escape. The suspect vehicle resumed flight and NMSP auto theft detectives soon joined the pursuit and utilized their vehicles to terminate the pursuit via a pursuit intervention technique (PIT). The driver, a female passenger and KAYLEIGH SMITH were detained. NMSP detectives subsequently arrested KAYLEIGH SMITH after discovering methamphetamine and heroin inside a pill bottle that had been on the seat next to her. The pill container bore her name.

o) On February 26, 2021, I spoke with a citizen neighbor who regularly walks past Subject Premises A-5. The neighbor told me that he thought the people in Subject Premises A-5 were selling drugs based on the heavy vehicle traffic at the house. The neighbor described the

vehicle traffic as being short in duration and consistent throughout the week and weekend. The neighbor described the persons visiting Subject Premises A-5 as looking like "junkies" and "zombies." The neighbor said at least 2-3 Hispanic male adults lived at Subject Premises A-5 with a Hispanic or Caucasian female. The neighbor said a couple of the Hispanic males were heavily tattooed and one was "pretty short," which he estimated to be about 5-03. The neighbor was unsure of the weight of the short Hispanic male, as he wore very baggy clothing.

p) A second neighbor reported suspected drug activity at Subject Premises A-5 and said they had previously complained to APD about the location.

q) Based on the information contained herein, I believe DOMINIC ANTHONY GUTIERREZ is currently staying at Subject Premises A-5 and maintaining a very low profile.

### SEARCHING FOR GANG TATTOOS:

164.     When the search warrants are executed, agents will attempt to interview the Target Subjects about their affiliation with the SNM and any other gangs. I believe gang tattoos to be significant evidence of gang affiliation and such

tattoos may constitute an overt act, in-so-much-as gang-specific tattoos enable a person to maintain or increase their position within the gang. I noted and successfully charged several SNM members with overt acts, within the context of a RICO conspiracy, for having one or more SNM tattoos.

165.     It has been my experience that many people lie when speaking with law enforcement and will sometimes go to great lengths to conceal their gang ties. Furthermore, the persons to be searched may exercise their constitutional right to refrain from speaking with law enforcement agents. In an effort to discern and document the Target Subject's gang affiliation, I am requesting law enforcement agents be permitted to search the male Target Subject's bodies, above the waist and below the thighs, for tattoos.

166.     I am aware that SNM members have distinct tattoos that represent their dedication to the SNM criminal enterprise. The members display these tattoos to gain respect within the enterprise and to intimidate non-members. Similarly, members of street gangs that support the SNM, such as the Westside Locos, 18th Street, 14th Street, San Jose, Valley Gardens, Brew Town, El Washe, Barelas and other street gangs have tattoos evidencing their membership and status within the gangs. I am seeking the court's permission to utilize law enforcement photographers to photograph and document the Target Subject's tattoos. Such photo

documentation would help positively identify subjects and better document and determine their gang affiliation.

167.     I am aware that some of the tattoos evidencing membership in or association with the SNM include, but are not limited to: the Zia symbol, the letters "SNM" or "S," the words "Sindicato," "Syndicato," "Burque," "Duke City," "New Mexico," the numbers "19," (S being the 19th letter of the alphabet) "505," the outline of the State of New Mexico, and other imagery that may signify New Mexico.

168.     Law enforcement and corrections department records that I have reviewed in this case indicate that all of the male Target Subjects have one or more tattoos on their bodies.     I believe the male Target Subjects may have gang related tattoos.

169.     **EXHIBIT 1**, which is attached hereto, contains several examples of SNM gang tattoos.

### BIOMETRIC ACCESS TO DEVICES

170.     Based on my experience investigating the SNM over the past six years, I am aware SNM members utilize cellular telephones to exchange information, photographs, and felonious communications, to include the names and locations of informants, witnesses, victims.     I have also observed SNM members discuss the status of SNM members (i.e., who is "good" or who has been greenlit) and which members have drugs for sale.     I have also

observed SNM members discuss the acquisition and distribution of firearms to and from other members, as well as discussions about gang related murders and assaults.

171.    I    know    from    my    training    and    experience investigating gangs and drug trafficking organizations that cellular telephones contain evidence of criminal conduct. More specifically, it has been my experience that cellular telephones are utilized to communicate drug prices, availability, quantity, and the contact information for customers and suppliers. I have also discovered photographs of controlled substances on cell phones,

172.    I know from my training and experience, as well as from information found in publicly available materials published by    device    manufacturers,    that    many    electronic    devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric    features    include    fingerprint    scanners,    facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

> a) If a device is equipped with a fingerprint scanner, a
>    user may enable the ability to unlock the device through
>    his or her fingerprints. For example, Apple offers a

**U.S. v. ROBERT PADILLA, et al., 1499**

feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

b) If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

c) If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

d) In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the device.

e) As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f) I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands

U.S. v. ROBERT PADILLA, et al., 1502

carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g) Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the Target Subjects to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of Target Subjects and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of Target Subjects and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that Target Subjects state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement

to ask Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION:

173.     Based on the foregoing, I believe that there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 1962(d), 1959, 1512, 1513, 924(c), 922(g), 2, and 21 U.S.C. §§ 856, 846, and 841(a)(1), as more particularly described in Attachment B will be found at the Subject Premises and on the male Target Subjects.   Therefore, I submit this affidavit supports probable cause to search the premises described in Attachment A and seize the items described in Attachment B.

174.     This affidavit has been reviewed by the Assistant United States Attorneys who serve as the lead prosecutors in the racketeering investigation of the SNM.

## REQUEST TO SEAL THIS AFFIDAVIT

175.    I am requesting this affidavit be FILED UNDER SEAL until further order of the Court. The information contained in this affidavit is part of an ongoing investigation and the premature disclosure of the information will endanger the life of the various CHS.

176.    I am also concerned that if this affidavit is unsealed during the pendency of the JODY RUFINO MARTINEZ jury trial, set to commence on March 1, 2021, the media may pick up the story and such reporting could interfere with the trial.

Respectfully submitted,

Bryan M. Acee
FBI Special Agent

SUBSCRIBED AND SWORN BEFORE ME ON MARCH 1, 2021.

THE HONORABLE KAREN M. MOLZEN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

**U.S. v. ROBERT PADILLA, et al., 1505**

**EXHIBIT 1**
Example SNM Gang Tattoos

**U.S. v. ROBERT PADILLA, et al., 1506**

## EXHIBIT 1
Example SNM Gang Tattoos



**U.S. v. ROBERT PADILLA, et al., 1507**

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry ___03/05/2021___

On March 3, 2021, at 6:00 a.m., agents and task force officers with the FBI and U.S. Marshals Service executed federal search warrants on the following premises and persons:

1. DENNIS CHARLES ARAGON, aka: "OSO," at ███████████████████ Albuquerque, New Mexico 87112 (Case No. 21MR262)
2. JOSE SANTIAGO RAMIREZ, aka: "TAZ" at ███████████████ Albuquerque, New Mexico 87102 (Case No. 21MR263)
3. VICTORIA JUANITA POHL-LUJAN at ████████████ Albuquerque, New Mexico 87105 (Case No. 21MR264)
4. LANCE ROMAN NATSEWAY, aka: "PEE-WEE," ███████████████ Albuquerque, New Mexico 87102 (Case No. 21MR265 )
5. DOMINIC ANTHONY GUTIERREZ, aka: "GAGE," ████████████ ██, Albuquerque, New Mexico 87120 (Case No. 21MR266)

The search warrants authorized agents to search the premises for evidence of violations of 18 U.S.C. § 1962(d) RICO Act conspiracy; 18 U.S.C. § 1959 VICAR; 18 U.S.C. § 1512 Tampering with a witness, victim, or an informant; 18 U.S.C. § 1513 Retaliating against a witness, victim, or an informant; 18 U.S.C. § 924(c) Use of a firearm in furtherance of a crime of violence or drug trafficking crime; 18 U.S.C. § 922(g) Prohibited person in possession of a firearm or ammunition; 18 U.S.C. § 2 Aiding and abetting; 21 U.S.C. § 856 Maintaining drug-involved premises; 21 U.S.C. § 846 Conspiracy to distribute controlled substances; and 21 U.S.C. § 841(a)(1) Possession with intent to distribute controlled substances. The search warrants also authorized agents to search the bodies of the male subjects for gang tattoos and to photograph such tattoos.

During the operation, the following subjects were arrested:

1. SNM member DENNIS CHARLES ARAGON, aka: "OSO," DOB:███████, was arrested at his residence and charged with possession with intent to distribute methamphetamine and heroin. ARAGON was interviewed by SA Bryan

---

Investigation on ___03/03/2021___ at __Albuquerque, New Mexico, United States (In Person)__

File # __245U-AQ-3150458__                                    Date drafted __03/03/2021__

by __Bryan Acee__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Government Exhibit 2                     **U.S. v. ROBERT PADILLA, et al., 1508**

245U-AQ-3150458

Continuation of FD-302 of (U) 3/3/21 Search/Arrest Warrant Operation ,On 03/03/2021 , Page 2 of 2

Acee and TFO Rafael Gomez, and subsequently booked into the
Bernalillo County Metropolitan Detention Center.

2. SNM member ARROW NATSEWAY, DOB: ████████, was arrested at the residence
of LANCE NATSEWAY on a state parole warrant for absconding from supervision.
ARROW NATSEWAY was turned over to state parole officers for processing.

3. SNM member LANCE ROMAN NATSEWAY, aka "PEE-WEE," DOB: ████████, was
arrested on an outstanding FBI warrant for being a  felon in possession of a
firearm at ████████████, Rio Rancho, NM, 87114. LANCE NATSEWAY was
booked into the USMS cell block at the federal courthouse.

Information pertaining to the searches of the five aforementioned residences
may be found in FD-302 reports under separate cover.

**U.S. v. ROBERT PADILLA, et al., 1509**

**U.S. Marshals Service (USMS)**
Washington, Washington DC
www.usmarshals.gov

▇▇▇▇▇▇
Confidential
Law Enforcement Use Only

| | |
|---|---|
| Offense Type: **Threat against a Federal Judge, Federal Judicial Employee or Federal Court Facility**<br>Delivered To: **USMS** ▇▇▇▇**-New Mexico, Judicial Security Division**<br>Follow-Up By: **2023/06/23** | Tip ID: ▇▇▇▇<br>Created: **2023/05/24**<br>Time: **7:25 PM** |

**Recipient**
USMS ▇▇▇▇–New Mexico

**Narrative**
There is again a threat against judge browning and the prosecution team in the SNM Rico case.

**Information**
**Suspect Name**: ▇▇▇▇▇▇
**City, State, Zip**: Albuquerque nm 87105
**Has this been reported to another agency?** No
**Who else has knowledge of this?** SNM higerarchy
**How did you hear about our program?** In Pursuit with John Walsh

**Tipster's Contact Information**
**Tipster's Name**: ▇▇▇▇▇
**Tipster's Address, City, State, Zip/Postal Code, Country**: ▇▇▇▇▇▇▇
**Tipster's Phone Number**: ▇▇▇▇

---

### Law Enforcement Sensitive

Please click here to complete the tip disposition upon conclusion of your investigation. If the link has been disabled, then you can enter Tip ID ▇▇▇▇ along with the Disposition ID ▇▇▇▇▇ into the disposition form located at https://www.p3tips.com/dispo.

Government Exhibit 3